[No. H033164. Sixth Dist. July 11, 2011.]

SANDRA CROSS, Plaintiff and Respondent, v.
STEPHEN COOPER et al., Defendants and Appellants.

COUNSEL

Cooper-Folb Law Offices, Gail S. Cooper-Folb; Atwood, Haiman & Westerberg and D. Kent Westerberg for Defendants and Appellants.

Dorfman Law Office and Gerald Barry Dorfman for Plaintiff and Respondent.

OPINION

RUSHING, P. J.—

### I. STATEMENT OF THE CASE

Sandra Cross (Cross) leased a house to Stephen and Laura Cooper. As the lease was about to expire, Cross put the house up for sale and entered a contract of sale with prospective buyers. After the prospective buyers backed out, Cross sued the Coopers for interfering with the sale and causing it to fail. In her complaint, Cross asserted several claims based, in part, on allegations that the Coopers disclosed, or threatened to disclose, information that a registered sex offender lived nearby. In response to the lawsuit, the Coopers filed an anti-SLAPP motion under Code of Civil Procedure section 425.16 to

strike those claims.[1] The trial court denied the motion, and the Coopers now appeal from that order. (§ 425.16, subd. (i).)[2]

We conclude that the trial court erred in denying the motion and remand the matter for further proceedings.

## II. THE PLEADINGS AND THE ANTI-SLAPP MOTION

### A. *The Complaint*

In her complaint, Cross asserted causes of action for breach of a residential lease agreement, breach of the implied covenant of good faith in the lease agreement, inducing prospective buyers to breach their purchase contract with Cross, intentional interference with that purchase contract, and intentional and negligent interference with prospective economic relations.

In support of these claims, Cross alleged that the Coopers leased a house from her from September 5, 2006, to August 31, 2007. Under the lease, Cross was permitted to show the house to prospective buyers. On June 26, 2007, Cross told the Coopers she was selling the house. On July 5, the Coopers told Cross not to put a "For Sale" sign up or show the house to prospective buyers. Cross alleged that the Coopers threatened to remove any sign, if she

---

[1] "SLAPP is an acronym for strategic lawsuit against public participation." (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1329, fn. 3 [93 Cal.Rptr.3d 782].)

All further unspecified statutory references are to the Code of Civil Procedure.

[2] Prior to this decision, codefendant and coappellant Laura Cooper filed for bankruptcy protection under chapter 7 of the Bankruptcy Code (11 U.S.C. §§ 701–784), which triggered a stay of judicial proceedings against her. (See 11 U.S.C. § 362(a) [automatic stay of judicial proceedings against debtor]; *Shaoxing County Huayue Import & Export v. Bhaumik* (2011) 191 Cal.App.4th 1189, 1196 [120 Cal.Rptr.3d 303].) This court initially stayed all proceedings on appeal as to codefendant and coappellant Laura Cooper. Generally, however, the automatic stay of judicial proceedings against a debtor in bankruptcy does not apply to nondebtor codefendants. (*Seiko Epson Corp. v. Ny-Kote International, Inc.* (Fed.Cir. 1999) 190 F.3d 1360, 1364–1365; *U.S. v. Dos Cabezas Corp.* (9th Cir. 1993) 995 F.2d 1486, 1491; *Wedgeworth v. Fibreboard Corp.* (5th Cir. 1983) 706 F.2d 541, 544.) Although there are some narrow exceptions in unique circumstances (e.g., *Matter of James Wilson Associates* (7th Cir. 1992) 965 F.2d 160, 168 [automatic stay does not operate in favor of nonbankrupt codefendants unless bankrupt defendant is an indispensable party]; *A.H. Robins Co. v. Piccinin* (4th Cir. 1986) 788 F.2d 994, 999 [identity between debtor and nonparty codefendant such that judgment against latter would automatically operate as judgment against debtor]), we do not find exceptional circumstances in this case.

We asked the parties to show cause whether there was any legal authority or reason that precluded this court from proceeding with the appeal against nondebtor, codefendant and coappellant Stephen Cooper. Having reviewed their responses, we find no binding legal authority or persuasive reason to delay proceedings in this appeal concerning Stephen Cooper.

The previous stay concerning debtor, codefendant and coappellant Laura Cooper shall remain in effect.

erected one, and they threatened to make negative comments about the property, including the location of a convicted sex offender who lived nearby, if she showed the property and did not agree to waive the rent for August 2007.

Cross further alleged that in August 2007 she had a contract with a prospective buyer, and the Coopers knew about it. Cross declined to waive the Coopers' August rent, and, in retaliation, the Coopers informed the buyer's agent that a sex offender lived close by. The proposed sale did not go through.

## B. *The Anti-SLAPP Motion*

In their motion, the Coopers sought dismissal of all causes of action except the claim that they breached the lease agreement. In a declaration, Stephen Cooper (Cooper), a real estate agent, stated that while leasing Cross's house, they learned that a registered sex offender lived across the street. In June 2007, after seeing police officers "raid[]" the offender's · house, Cooper expressed concern about it to Cross. Cross explained that it was just a home inspection. Later in June, Cross said she was selling the house but did not intend to disclose that the offender lived nearby because she thought it would make the house unsellable. In August, Cooper spoke to a prospective buyer's agent, who informed him that the buyer might have children. Because of the risk to children posed by a registered offender living nearby, Cooper "discussed" Megan's Law and the duty of a real property seller to disclose information about real property and then told the agent that "a registered offender lived immediately across the street."[3] Cooper declared that he did not offer that information for the purpose of interfering with Cross's contract with the prospective buyer.

In support of their motion, the Coopers argued, in essence, that except for breach of the lease agreement, Cross's claims were based on disclosing, or threatening to disclose, the location of the offender; that disclosure or the threat to disclose constituted an act in furtherance of their First Amendment right of free speech because it concerned a matter of public interest; and Cross could not show a probability of success on her claims.

In opposition to the motion, Cross submitted a copy of the lease agreement, under which the tenancy expired on August 31, 2007; the Coopers were required to make the house available for Cross to show prospective buyers on

---

[3] "California's Megan's Law (Penal Code §§ 290.4, 290.45) is a scheme of detailed provisions for the collection and limited disclosure of information regarding sex offenders who are required to register by Penal Code section 290." (*Fredenburg v. City of Fremont* (2004) 119 Cal.App.4th 408, 413 [14 Cal.Rptr.3d 437], fn. omitted (*Fredenburg*).)

24 hours' notice; and Cross was authorized to place a "For Sale" sign on the premises. Cross also submitted a copy of a purchase agreement between her and Wayne and Sulina Chan, which included a statutorily required disclosure about Megan's Law and California Megan's Law Web site (ML Web site) where they could find specific information about registered sex offenders.

In her declaration, Cross stated that long before leasing to the Coopers, she lived in the house and knew that the offender lived nearby. She did not consider him a threat because his last known offense was in 1979, he had been living in the area since 1993, and he had had the same job for 14 years. After leasing her house, she remained in the area for a while and stayed in contact with her neighbors. At no time was she ever aware of any neighborhood controversy about the offender.

Cross further declared that in June 2007, she informed the Coopers that she was putting her house up for sale. Toward the end of June, she advised the Coopers that she wanted to have it sold by September 1 "for the school year." In a series of e-mails between July 5 and 12, copies of which Cross attached to her declaration, Cooper initially informed Cross that the house would not be available to show until after they vacated the property on August 31 and told her not to put up a "For Sale" sign. In his next e-mail, Cooper said, among other things, that if Cross provided 48 hours' notice, he would maintain the house in show condition and allow her access on Tuesdays from 3:00 p.m. to 5:00 p.m. "in exchange for August rent free and confirmation of our $2,500 deposit being returned on August 31 after a walk through." In another e-mail a few hours later, Cooper reiterated that he would cooperate with efforts to show the house on Tuesdays but "cannot and will not guarantee our cooperation on any other day or time and I make no promises that I will not give my opinion, which is my right, to buyers regarding your price, the sherrif's [sic] raid on the sexual predators next door three weeks ago or anything else I feel I have an opinion [sic]." A few days later, Cooper sent two e-mails in which he promised "complete cooperation on Tuesday afternoons 3:00–5:00 pm to show the property to as many buyers as you wish with full access to the property."

In her declaration, Cross stated that she believed Cooper had made a "threat, designed to cause me fear, that prospective buyers would be told about the location of specific registered sex offenders" unless she provided the Coopers with free rent for a month or increased their property rights.

Cross also submitted the declaration of Mark Thomason, her real estate agent. He stated that he tried to, but did not, post a "For Sale" sign on the property because someone there threatened to remove it if he did. After

learning that the Coopers would not allow a sign or entry to show the house, Thomason spoke to Cooper, who eventually allowed a sign. Thomason then received calls from prospective buyers. However, Cooper remained adamant that no one enter the house. As a result, opportunities to show the house diminished.[4] Thomason said on many occasions he was denied access to the house despite giving proper notice. Sometimes Cooper agreed to allow access but then changed his mind or the time of access, and as a result Thomason lost the chance to show the house. During this time, Cooper informed Thomason that he had "information" he could share that would prevent a sale. According to Thomason, Cooper engaged in "tactics" that were not conducive to showing or selling the property, such as limiting the day or times that the house could be shown. Nevertheless, on August 2, 2007, Cross entered into a contract of sale with Wayne and Sulina Chan. The contract contained numerous provisions advising the Chans to investigate property conditions. One provision entitled "Megan's Law" directed the Chans to the California registered sex offender database—i.e., the ML Web site. In a separate disclosure form, Cross listed various things about the neighborhood, including the fact that "the police [had] visited the house across the street in the last few months."

Shortly after the contract was signed, Michael Majchrowicz, the Chans' real estate agent, told Thomason that Cooper had informed him that a registered sex offender lived across the street but had asked Majchrowicz to say that he learned the information from an anonymous person. In response, Thomason referred Majchrowicz to the Megan's Law disclosure in the Chans' contract of sale. Thereafter, the Chans refused to sign a disclosure statement about the offender and declined to buy the property.

Cross also submitted declarations from six current or former residents of the area, some of whom had children. All stated that they knew about the registered offender but felt he neither posed a risk nor made the area less desirable or valuable. None considered his presence to be a topic of controversy or discussion in the area.

In opposition to the motion, Cross claimed that the Coopers' threat to disclose and later disclosure about the offender's location was illegal and thus not constitutionally protected conduct. Specifically, she argued that the threat to disclose unless she waived rent constituted attempted extortion. Cross further argued that the actual disclosure was an unlawful use of that information. Cross also claimed that she made a prima facie showing that she was likely to succeed on the merits of her claims.

---

[4] In an e-mail to Cross, Cooper stated that he and his wife had a newborn infant, and because he had not yet been immunized, they did not want "him to be subjected to strangers coming inside the home with potential harm to [him]."

In reply, the Coopers asked the trial court to take judicial notice of "the terms and conditions page of the Attorney General [*sic*] website on Megan's Law" and a publication of the California Association of Realtors concerning Megan's Law.[5]

The Coopers argued that Cross could not establish that disclosure or threatened disclosure of information was illegal as a matter of law and, therefore, outside constitutional protection. They also reiterated arguments that the disclosure involved an issue of public interest and that Cross had failed to show a probability of success on the merits of her claims.

### C. *The Trial Court's Ruling*

In denying the motion, the court found that the cause of action for breach of the implied covenant of good faith contained allegations that, in essence, accused Cooper of attempting to extort one month's free rent from Cross by disclosing the location of the offender. Since attempted extortion is a crime (Pen. Code, § 524), the court concluded that the threat did not qualify for anti-SLAPP protection. Accordingly, the court declined to dismiss that cause of action.

Concerning the remaining causes of action, all of which were based on actual disclosure, the court, citing *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107 [1 Cal.Rptr.3d 501] (*Du Charme*), concluded that because there was no evidence of any ongoing controversy, dispute, or discussion about the location of the offender, the disclosure did not involve "a matter of public interest" and, therefore, did not qualify for anti-SLAPP protection.

Given its findings, the court declined to rule on the Coopers' evidentiary objections or determine whether Cross had shown a probability of success on the merits of her claims.

### III. ANTI-SLAPP MOTION PROCEDURE

Section 425.16 is called the anti-SLAPP statute because it allows a defendant to gain early dismissal of causes of action that are designed primarily to chill the exercise of First Amendment rights. (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1568 [31 Cal.Rptr.3d 368]; *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1069–1070 [112 Cal.Rptr.2d 397].) In

---

[5] The Coopers also lodged objections to various parts of the declarations submitted in opposition to their motion. They also filed a motion for sanctions against Cross on grounds that her complaint was frivolous and intended to harass them.

pertinent part, the statute provides, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike . . . ." (§ 425.16, subd. (b)(1).)

Acts "in furtherance of" these rights include "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest or, (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

In ruling on an anti-SLAPP motion, the trial court engages in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*); accord, *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [3 Cal.Rptr.3d 636, 74 P.3d 737].) "The plaintiff's showing of facts must consist of evidence that would be admissible at trial." (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1346 [63 Cal.Rptr.3d 798] (*Hall*); see *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1496–1498 [45 Cal.Rptr.2d 624].) Both the defendant moving party and the plaintiff must make a prima facie showing concerning their respective burdens. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 646 [49 Cal.Rptr.2d 620] (*Wollersheim*), disapproved on another point in *Equilon, supra,* 29 Cal.4th at p. 68, fn. 5.) Only where a defendant shows that a cause of action is based on protected conduct and the plaintiff *fails* to show a probability of success on that claim is it subject to dismissal. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88–89 [124 Cal.Rptr.2d 530, 52 P.3d 703] [cause of action must arise from protected speech or petitioning and lack even minimal merit].)

On appeal, we review the motion de novo and independently determine whether the parties have met their respective burdens. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 79 [55 Cal.Rptr.3d 600]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103 [15 Cal.Rptr.3d 215].) In evaluating the motion, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we do not weigh credibility or compare the weight of the evidence. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].)

## IV. DISCUSSION

Cooper contends that the trial court erroneously concluded that he had not shown that Cross's claims were based on protected conduct. We agree.

### A. *Issue of Public Interest*

Cooper notes that all of the causes of action were based, at least in part, on allegations that Cooper threatened to disclose or disclosed that a sex offender lived nearby. In his declaration, Cooper conceded that he told a real estate agent about the offender. As noted, he declared, "Because of the risk presented to children by the close proximity of a registered sex offender to the property, I discussed Megan's Law and the seller's duty of disclosure attendant thereto, and stated that a registered sex offender lived immediately across the street."

Cooper claims that this discussion and disclosure (and presumably stating an intention to disclose) qualified for anti-SLAPP protection under section 425.16, subdivision (e)(4), which protects conduct "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech *in connection with a public issue or an issue of public interest.*" (Italics added.) Cooper argues that his conduct was connected with issues of public interest, namely, child molestation, a real property owner's duty to disclose actual knowledge about registered sex offenders, and the location of a particular offender.

■ Section 425.16 does not define "public interest" or "public issue." Those terms are inherently amorphous and thus do not lend themselves to a precise, all-encompassing definition. (See *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 929 [130 Cal.Rptr.2d 81] (*Rivero*); see also *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 [2 Cal.Rptr.3d 385] (*Weinberg*) ["it is doubtful an all-encompassing definition could be provided"].) Some courts have noted

commentary that " ' "no standards are necessary because [courts and attorneys] will, or should, know a public concern when they see it." ' [Citation.]" (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122, fn. 9 [81 Cal.Rptr.2d 471, 969 P.2d 564] (*Briggs*); see *D.C. v. R.R.* (2010) 182 Cal.App.4th 1190 [106 Cal.Rptr.3d 399] (*D.C.*); *Du Charme, supra,* 110 Cal.App.4th at p. 117.)

Nevertheless, courts have discussed how to decide whether a statement concerns a matter of public interest. In *Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027 [72 Cal.Rptr.3d 210] (*Nygård*), the court pointed out that although section 425.16 does not define " 'public interest,' " it does mandate that its provisions " 'be construed broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Nygård,* at p. 1039, quoting § 425.16, subd. (a).)[6] The court explained that "[t]he directive to construe the statute broadly was added in 1997, when the Legislature amended the anti-SLAPP statute 'to address recent court cases that have too narrowly construed California's anti-SLAPP suit statute.' [Citation.]" (*Nygård,* at p. 1039; *Briggs, supra,* 19 Cal.4th at p. 1120 [recognizing this legislative intent]; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23 [53 Cal.Rptr.3d 752] (*Gilbert*) [same].)

Accordingly, courts have broadly construed " 'public interest' " "to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.]" (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [102 Cal.Rptr.2d 205] (*Damon*); accord, *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1468 [37 Cal.Rptr.3d 133] (*Ruiz*); see *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 893 [17 Cal.Rptr.3d 497] (*Wilbanks*) [§ 425.16, subd. (e)(3) & (4) are "quite broad"].) Indeed, even before the Legislature mandated broad construction, the court in *Wollersheim, supra,* 42 Cal.App.4th 628, opined that "[a]lthough matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." (*Id.* at p. 650; accord, *Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 674 [64 Cal.Rptr.2d 222] (*Macias*); *Damon, supra,* 85 Cal.App.4th at p. 479; *Turner v. Vista Pointe Ridge Homeowners Assn.* (2009) 180 Cal.App.4th 676, 684 [102 Cal.Rptr.3d 750].) And in *Nygård, supra,* 159 Cal.App.4th at page 1042, the court opined that

---

[6] Section 425.16, subdivision (a) provides: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly."

taken together, the legislative history of the amendment and the cases that precipitated it "suggest that 'an issue of public interest' . . . is *any issue in which the public is interested.* In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest."[7]

In *Rivero, supra,* 105 Cal.App.4th 913, the court reviewed several cases and described three nonexclusive and sometimes overlapping categories of statements that have been given anti-SLAPP protection. (*Id.* at pp. 919–924.) The first category comprises cases where the statement or activity precipitating the underlying cause of action was "a person or entity in the public eye." (*Id.* at p. 924.)[8] The second category comprises cases where the statement or activity precipitating the underlying cause of action involved "conduct that could directly affect a large number of people beyond the direct participants."[9] (105 Cal.App.4th at p. 924.) And the third category comprises cases where the statement or activity precipitating the claim involved "a topic of widespread, public interest." (*Ibid.*)[10] Courts have adopted these categories

[7] Although *Nygård* dealt with the scope of section 425.16, subdivision (e)(3), and this case deals with subdivision (e)(4), *Nygård*'s discussion of "public interest" is pertinent because both subdivisions apply to statements that are made in connection with an issue of "public interest." Subdivision (e)(3) additionally requires that the statements be made "in a place open to the public or a public forum." (§ 425.16, subd. (e)(3).)

[8] See, e.g., *Gilbert, supra,* 147 Cal.App.4th 13 (statements about a nationally recognized plastic surgeon); *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146 [15 Cal.Rptr.3d 100] (statements about lesbian couple that had achieved national attention); *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798 [119 Cal.Rptr.2d 108] (statements about a participant in popular national reality TV show); *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993 [113 Cal.Rptr.2d 625] (statements about a large publicly traded company); *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226 [83 Cal.Rptr.2d 677] (*Sipple*) (statements about a nationally known political consultant for major candidates); *Wollersheim, supra,* 42 Cal.App.4th 628 (statements about a church having considerable size, membership, assets, and media coverage).

[9] See, e.g., *Damon, supra,* 85 Cal.App.4th 468 (critical statements about the general manager of a senior citizen residential community made in connection with upcoming board elections and recall campaigns affecting 3,000 residents); *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400 [103 Cal.Rptr.2d 174] (*Dowling*) (letter to the board of large condominium complex concerning safety and nuisance issues); *Macias, supra,* 55 Cal.App.4th 669 (critical statements during a union election affecting 10,000 members); *Wollersheim, supra,* 42 Cal.App.4th 628 (statements critical of a church with a large congregation); *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62] (statements opposing the location of a battered women's shelter in the neighborhood); *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8 [43 Cal.Rptr.2d 350] (conduct opposing the development of a mall because of its environmental impact on the area).

[10] See, e.g., *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664 [105 Cal.Rptr.3d 98] (widespread interest in the look, sound, and lifestyles of indie rock bands); *Gilbert, supra,* 147 Cal.App.4th 13 (the pros and cons of plastic surgery); *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515 [44 Cal.Rptr.3d 517] (*Fitzgibbons*) (the survival of local hospitals); *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 [33

as a useful framework for analyzing whether a statement implicates an issue of public interest and thus qualifies for anti-SLAPP protection.[11]

■ In *Weinberg, supra,* 110 Cal.App.4th 1122, the court, citing federal cases rather than state anti-SLAPP cases, enumerated what it considered to be additional attributes of an issue that would render it one of public, rather than merely private, interest. "First, 'public interest' does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy . . . .' [Citation.] Finally, . . . [a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." (*Id.* at pp. 1132–1133.)

With this background in mind, we turn to whether Cooper's disclosure about the registered offender who lived nearby constituted protected speech in connection with an issue of public interest. (§ 425.16, subd. (e)(4).) We find more specific guidance in three cases.

In *M.G., supra,* 89 Cal.App.4th 623, the defendants used a 1997 photograph of a Little League team in their 1999 magazine article and television show to illustrate stories about adult coaches who sexually molest young athletes. (*Id.* at p. 626.) Those pictured in the photograph sued, and the defendants sought anti-SLAPP protection. The court concluded that use of the photograph was protected conduct because it was closely connected to an issue of widespread public interest. The court found that "child molestation in

Cal.Rptr.3d 145] (*Terry*) (inappropriate relationships between adults and minors); *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050 [28 Cal.Rptr.3d 933] (relationships between men and women); *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228 [29 Cal.Rptr.3d 521] (*Huntingdon Life Sciences*) (animal testing); *Annette F. v. Sharon S., supra,* 119 Cal.App.4th 1146 (second-parent adoptions, particularly in the gay and lesbian community); *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156 [1 Cal.Rptr.3d 536] (unlawful dispensing of prescription drugs); *M.G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623 [107 Cal.Rptr.2d 504] (*M.G.*) (molestation of child athletes by coaches); *Sipple, supra,* 71 Cal.App.4th 226 (domestic violence).

[11] See, e.g., *D.C., supra,* 182 Cal.App.4th at page 1215; *Century 21 Chamberlain & Associates v. Haberman* (2009) 173 Cal.App.4th 1, 9 [92 Cal.Rptr.3d 249]; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1573 [92 Cal.Rptr.3d 227] (*World Financial Group*); *Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736 [87 Cal.Rptr.3d 347] (*Hailstone*); *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 814 [6 Cal.Rptr.3d 675]; *Wilbanks, supra,* 121 Cal.App.4th at page 898.

youth sports" was an issue like domestic violence that "is significant and of public interest." (*Id.* at p. 629, fn. omitted.) The court rejected an argument that the photograph involved only the identity of the molestation victims and did not implicate a broader issue of public interest. (*Ibid.*)

In *Terry, supra,* 131 Cal.App.4th 1534, the pastor of a church disseminated a confidential report by a church investigative committee to about 100 people, in which the committee substantiated complaints by a girl's parents that two adult youth group leaders had developed and pursued an inappropriate relationship with the girl. The committee further found that the two adults were grossly negligent and insubordinate, concluded that their termination was warranted, and recommended various measures to prevent a recurrence of such misconduct. (*Id.* at pp. 1540–1543.) The court concluded that disseminating the report qualified for protection because it implicated an issue of public interest. (*Id.* at p. 1546.) The court found that "the communications clearly involved issues of public interest, because they involved the societal interest in protecting a substantial number of children from predators . . . ." (*Id.* at p. 1547.) The court rejected a claim that the only issue was a private relationship between the adults and the girl. "The issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest. The public interest is society's interest in protecting minors from predators, particularly in places such as church programs that are supposed to be safe." (*Ibid.*)

█ *M.G.* and *Terry* demonstrate the obvious: preventing child sexual abuse and protecting children from sexual predators are issues of widespread public interest. Thus, insofar as Cooper's disclosure served those interests by alerting prospective buyers of the potential risk to children posed by a registered sex offender who lived nearby, his conduct involved a private communication directly related to an issue of considerable interest to the general public and qualifies for anti-SLAPP protection.

Closely and directly related to the general issues of child molestation and the protection of children from sexual predators are issues concerning registered sex offenders. In this regard, we find the recent case of *Mendoza v. ADP Screening and Selection Services, Inc.* (2010) 182 Cal.App.4th 1644 [107 Cal.Rptr.3d 294] (*Mendoza*) to be pertinent. There, the defendant, an employment screening service, conducted a preemployment background check of the plaintiff, which included looking on the ML Web site to see if he was listed. The plaintiff was not hired and later sued the defendant. Although the complaint did not allege that the ML Web site had information about the plaintiff or that the defendant disclosed information from the ML Web site about him, such factual allegations were implicit. (*Id.* at p. 1649.) The court

concluded that in disclosing the information, the defendant was "engaged in constitutionally protected speech on a subject of public interest." (*Id.* at p. 1653.) The court explained that "the Legislature, in enacting the statutory scheme establishing the Megan's Law (ML) Web site, issued several findings which openly expressed the public's strong interest in the dissemination of information regarding registered sex offenders. [Citations.] We are also swayed by the public interest in safe workplaces, and in the liability which may attach to employers who fail to investigate prospective employees where prudence justifies such an investigation. Thus, as a foundational, broad-based proposition, we conclude that providing employment-screening reports is a constitutionally founded, protected activity within the meaning of the anti-SLAPP statute." (*Ibid.*)

The legislative findings referred to in *Mendoza* were outlined in *Fredenburg, supra,* 119 Cal.App.4th 408. "California enacted its Megan's Law in 1996. [Citation.] In an uncodified preamble to the statute, the Legislature made several findings and declarations. The Legislature found that sex offenders 'pose a high risk of engaging in further offenses after release,' and that 'protection of the public from these offenders is a paramount public interest.' [Citation.] [¶] The Legislature further found that the public had a 'compelling and necessary . . . interest' in obtaining information about released sex offenders so they can 'adequately protect themselves and their children from these persons.' [Citation.] Because of 'the public's interest in public safety,' released sex offenders 'have a reduced expectation of privacy . . . .' [Citation.] [¶] 'In balancing the offenders' due process and other rights against the interests of public security, the Legislature finds that releasing information about sex offenders under the circumstances specified in this act will further the primary government interest of protecting vulnerable populations from potential harm.' [Citation.] The Legislature found that (1) the registration of sex offenders, already required by Penal Code section 290; (2) 'the public release of specified information about certain sex offenders' as contemplated by Megan's Law; and (3) the contemplated 'public notice of the presence of certain high-risk sexual offenders in communities' will combine to further the governmental interest of public safety. [Citation.] [¶] The Legislature distinguished between 'serious' and 'high-risk' sex offenders. 'To protect the safety and general welfare of the people of this state, it is necessary to provide for continued registration of sex offenders, for the public release of specified information regarding *certain more serious sex offenders,* and for community notification *regarding high-risk sex offenders'* who are about to be released or who already live in the community. [Citation.] The policy of releasing information to the public 'about serious and high-risk sex offenders' is not meant to be punitive but is designed simply to protect the public. [Citation, italics omitted.] [¶] Finally,

the Legislature addressed the possibility of misuse of Megan's Law information. 'The Legislature . . . declares . . . that in making information available about certain sex offenders to the public, it does not intend that the information be used to inflict retribution or additional punishment' on the sex offender. The Legislature found 'that the dangers to the public of nondisclosure far outweigh the risk of possible misuse of the information,' and referred to studies in Oregon and Washington showing that Megan's Laws in those states 'resulted in little criminal misuse of [disclosed] information . . . .' [Citation.]" (*Id.* at pp. 412–413, fn. omitted.)

The Legislature reiterated and reaffirmed these findings when it enacted the Sex Offender Punishment Control and Containment Act of 2006 (Pen. Code, § 290.03), where it also stated, "The Legislature finds and declares that a comprehensive system of risk assessment, supervision, monitoring and containment for registered sex offenders residing in California communities is necessary to enhance public safety and reduce the risk of recidivism posed by these offenders." (Pen. Code, § 290.03, subd. (a).)

We agree with the conclusion in *Mendoza.* The statements of intent and the legislation noted above reflect heightened concern about the potential dangers posed by convicted sex offenders and strong and widespread public interest in knowing the location of registered sex offenders.

We further note that under Civil Code section 2079.10a, residential leases and rental agreements and contracts for the sale of residential units must contain a provision notice that gives prospective renters, lessees, and buyers notice concerning the California's sex offender databases and the types of information contained in them, including the specific location of offenders.[12] This requirement reflects not only the general public interest in

---

[12] Civil Code section 2079.10a provides, in relevant part, "(a) Every lease or rental agreement for residential real property entered into on or after July 1, 1999, and every contract for the sale of residential real property comprised of one to four dwelling units entered into on or after that date, shall contain, in not less than 8-point type, a notice as specified in paragraph (1), (2), or (3). [¶] (1) A contract entered into by the parties on or after July 1, 1999, and before September 1, 2005, shall contain the following notice: [¶] Notice: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more, and many other local law enforcement authorities maintain for public access a database of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The database is updated on a quarterly basis and is a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a '900' telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the '900' telephone service. [¶] (2) A contract entered into by the parties on or after September 1, 2005, and before April 1, 2006, shall contain either the notice specified in paragraph (1) or the notice specified in paragraph (3). [¶] (3) A contract entered into by the

the dissemination of information about registered sex offenders but also the specific public interest in making sure that prospective renters, lessees, and buyers know where to find this information so they can better determine whether they want to live in a particular neighborhood.

Here, Cooper's conversation with the agent mirrors the disclosure of information in *Mendoza* and, as discussed above, was closely and directly related to specific issues of great interest to the general public.

Given *M.G.*, *Terry*, and *Mendoza*, the laws concerning the collection and dissemination of information about registered offenders, and the Legislature's expressions of intent in enacting those laws, we have no difficulty concluding that Cooper made a prima facie showing that most of Cross's causes of action arise from protected activity. In other words, Cooper satisfied his burden to show that his disclosure and expression of intent to disclose were taken in furtherance of his right of free speech in connection with an issue of "widespread, public interest." (*Rivero, supra*, 105 Cal.App.4th at p. 924; see § 425.16, subd (e)(4); cases cited *ante*, in fn. 9.)[13]

We acknowledge that " '[t]he fact that "a broad and amorphous public interest" can be connected to a specific dispute is not sufficient to meet the statutory requirements' of the anti-SLAPP statute." (*World Financial Group, supra*, 172 Cal.App.4th at p. 1570, quoting *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 [55 Cal.Rptr.3d 544]; accord, *D.C., supra*, 182 Cal.App.4th at p. 1216; e.g., *Century 21 Chamberlain & Associates v. Haberman, supra*, 173 Cal.App.4th 1 [demand to arbitrate negligence claim does not implicate broader public interest in arbitration in general]; *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595 [132 Cal.Rptr.2d 191] (*Consumer Justice Center*) [statements about an herbal supplement for breast enlargement does not implicate broader public interest in consumer information, alternative medicine, or the efficacy and benefits of herbal supplements]; *Rivero, supra*, 105 Cal.App.4th 913 [statements about termination of particular union supervisor do not implicate broader public interest in unlawful workplace activity in publicly financed institutions].)

parties on or after April 1, 2006, shall contain the following notice: [¶] Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides."

[13] Our conclusion finds further support in the extensive media coverage that is given to the location of registered offenders. (See, e.g., *Wollersheim, supra*, 42 Cal.App.4th 628 [media coverage supports finding that large church is a matter of public interest].)

This case, however, does not involve some broad and amorphous public interest in an issue that one might rationally abstract from Cooper's conversation. As noted, the conversation involved the location of a registered sex offender, a subject specifically and directly related to an issue of compelling and widespread interest.

Citing *Du Charme, supra,* 110 Cal.App.4th 107, Cross reiterates the analysis and conclusion of the trial court that Cooper's conversation did not involve a matter of widespread public interest but was a private communication about the location of a registered offender and a matter of minimal interest about which there was no ongoing controversy, discussion, or debate. We find this analysis to be unpersuasive.

In *Du Charme, supra,* 110 Cal.App.4th 107, a union local posted a notice on its Web site informing members that a former business manager had previously been removed for mismanagement and assuring the members that the local's business would continue to be run smoothly. (*Id.* at pp. 113–114.) Concerning whether the posting was protected activity, the court reviewed three cases: *Damon, supra,* 85 Cal.App.4th 468, *Macias, supra,* 55 Cal.App.4th 669, and *Rivero, supra,* 105 Cal.App.4th 913.

In *Damon, supra,* 85 Cal.App.4th 468, statements critical of the manager of a large residential community were widely disseminated to board members and residents in connection with upcoming elections and recall campaigns. The *Damon* court found the statements protected because they involved an issue of interest to the residents: how that community would be governed. (*Id.* at pp. 474–475.) In *Macias, supra,* 55 Cal.App.4th 669, a candidate for a union position criticized another candidate during an election. The *Macias* court held the statements protected because they involved an issue of interest to the numerous members of the union: the qualifications of a candidate for office. (*Id.* at pp. 673–674.) In *Rivero, supra,* 105 Cal.App.4th 913, a union published statements concerning the termination and demotion of a supervisor of eight custodians at a public university due to alleged misconduct. The court held that the statements were not protected because the supervisor was not a person in the public eye; the statements were of interest only to union members and the custodians; and how the supervisor had conducted himself was itself a matter of public interest or sufficiently connected to the broader and general issue of unlawful workplace activity in public institutions. (*Id.* at p. 924.) Although the statements had been widely published, the court opined that mere publication did not necessarily or automatically transform an essentially private matter (termination) into an issue of public interest. (*Id.* at p. 926.)

According to the *Du Charme* court, none of these cases involved issues of *widespread* public interest; rather they involved issues of interest to limited,

definable portions of the public—e.g., in *Damon*, only those living in a residential community have any interest in the general issue of the association's governance and in *Macias* and *Rivero*, only union members would be interested in the general issue of the qualifications of candidates or the termination of supervisors. The court observed, however, that what distinguished the statements in *Damon* and *Macias*, which qualified for protection, from those in *Rivero*, which did not, was that only the former were made in the context of an ongoing controversy, dispute, or discussion about the issue within the relevant, definable group. Thus, the court opined that although the statements concerned issues of only limited interest, they nevertheless ought to be protected because doing so would serve "the anti-SLAPP statute's purpose of encouraging participation in an ongoing controversy, debate or discussion." (*Du Charme, supra*, 110 Cal.App.4th at p. 118, fn. & italics omitted.)

■ The court then turned its observation into a rule, holding that "to satisfy the public issue/issue of public interest requirement . . . , in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme, supra*, 110 Cal.App.4th at p. 119, fn. omitted.)

Applying its newly minted rule, the *Du Charme* court concluded that the union's Web site posting did not qualify for protection because it was "unconnected to any discussion, debate or controversy"—the supervisor had been terminated months before, his termination was no longer an issue, and union members were not being asked to take a position on the matter. (*Du Charme, supra*, 110 Cal.App.4th at p. 118.) The court found that "[t]o grant protection to mere informational statements, in this context, would in no way further the statute's purpose of encouraging *participation* in matters of public significance [citation]." (*Ibid.*)[14]

---

[14] In a footnote, the court implicitly recognized that it could be difficult to reconcile its new rule with existing case law, citing, for example, *Dowling, supra*, 85 Cal.App.4th 1400. (*Du Charme, supra*, 110 Cal.App.4th at p. 118, fn. 1.)

In *Dowling*, a dispute erupted between the Dowlings, who owned a condominium, and the Whites, who leased it. During the Dowlings' third unlawful detainer action to evict the Whites, the Whites' lawyer wrote a letter to members of the board of the condo complex, complaining about how the Dowlings' campaign of harassment, threats, and prowling around had made them feel unsafe. Counsel implied that the Dowlings had caused the Whites' phone service to be terminated and the water heater to be turned off, which created a potentially dangerous

Even though the *Du Charme* rule was derived from an observation of only three cases and not based on a more comprehensive survey of cases, an analysis of legislative intent, or a discussion of statutory interpretation, the rule has been uncritically accepted.[15]

situation. Counsel asked the board to conduct an investigation to correct or eliminate the nuisance and potential danger. Because of the letter, the Dowlings sued the Whites. (*Dowling, supra*, 85 Cal.App.4th at pp. 1406–1408.)

The *Dowling* court concluded that the letter qualified for protection for two reasons: it was made in connection with issues currently under review by a court in connection with the unlawful detainer action (§ 425.16, subd. (e)(2)) and, pertinent here, in connection with a public issue (§ 425.16, subd. (e)(4)). Concerning the latter, the court viewed "public issue" broadly and found that the letter qualified for protection because it was intended to advise the board "of the potential nuisance and the safety concerns" that would be of general interest to the residents. (*Dowling, supra*, 85 Cal.App.4th at p. 1420.)

Clearly, under the *Du Charme* rule, the letter would not qualify for protection. It involved a private dispute; its content was of potential interest only to the limited group of condo residents; and before the letter was sent, there had been no ongoing controversy, discussion, or debate about the Dowlings' alleged conduct except between them and the Whites.

The *Du Charme* court characterized *Dowling* as "somewhat anomalous" and its "public issue" analysis as "dicta." (*Du Charme, supra*, 110 Cal.App.4th at p. 118, fn. 1.) Nevertheless, it observed that counsel's letter was not "*merely* information" but was intended to give the board a chance to correct a dangerous situation that might affect others at the complex. (*Ibid.*) This observation, however, does not make the content of the letter a matter of public interest or otherwise reconcile *Dowling* with the new rule.

[15] See, e.g., *D.C., supra*, 182 Cal.App.4th at page 1215; *World Financial Group, supra*, 172 Cal.App.4th at pages 1572–1573; *Hailstone, supra*, 169 Cal.App.4th at page 738; *Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP* (2007) 146 Cal.App.4th 841, 848 [53 Cal.Rptr.3d 256]; *Fitzgibbons, supra*, 140 Cal.App.4th at page 524; *Ruiz, supra*, 134 Cal.App.4th at page 1468; *Terry, supra*, 131 Cal.App.4th 1534, 1549; *Wilbanks, supra*, 121 Cal.App.4th at page 900, footnote 5.

Although the rule has been accepted, the result in *Du Charme* easily could have been reached without the creation of a new rule. Moreover, we believe new, judicially created prerequisites for anti-SLAPP protection should be propounded cautiously and with great perspicacity, especially where, as in *Du Charme*, the new rule is based on minimal authority and narrows the meaning of "public interest" despite the Legislature's mandate to interpret the anti-SLAPP statute broadly. Indeed, the adoption of new prerequisites can raise more questions than they answer, as in *Du Charme*, where the court recognized that the new rule raised difficult additional questions concerning "what limitations there might be on the size and/or nature of a particular group, organization, or community, in order for it to come within the rule we enunciate today." (*Du Charme, supra*, 110 Cal.App.4th at p. 119.)

The reason for our concern about new, judicially created rules narrowing anti-SLAPP protection becomes more apparent in *Wilbanks, supra*, 121 Cal.App.4th 883. There, the court expanded upon *Du Charme* and ruled that "it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." (*Id.* at p. 898.) Thus, it appears that even statements directly concerning issues of *widespread* public interest—i.e., the *Rivero* third category—do not qualify for protection unless there is some existing ongoing controversy, dispute, debate, or discussion about those issues *and* the statements contribute to that debate. In support of its expansion of the *Du Charme* rule, the *Wilbanks* court provided no analysis and simply cited, without further discussion, *Du Charme, supra*, 110 Cal.App.4th 107, *Consumer Justice Center, supra*, 107 Cal.App.4th 595, and *Rivero, supra*, 105 Cal.App.4th 913. However, those cases do not support the rule.

In this case, *Du Charme* is inapposite. The circumstances here are distinguishable from those in *Du Charme* as well as those in *Damon, Macias,* and *Rivero.* Those cases did not involve statements closely connected to issues of widespread public interest. In particular, the termination of union personnel in *Du Charme, Macias,* and *Rivero* raised issues that only union members would be interested in, and the criticism of a candidate for the board of the senior residential community in *Damon* raised issues that only the residents would be interested in. Here, however, the disclosure about the nearby offender directly implicated issues concerning the protection of people, especially children, from sexual offenders and the location of registered offenders—i.e., issues that would be of interest to most people, especially those who are living in or considering moving to the area. Moreover, we reject Cross's attempts to characterize Cooper's conversation as merely a private conversation about private matters of no interest to anyone but the participants. (Cf. *M.G., supra,* 89 Cal.App.4th at p. 629 [rejecting the plaintiff's narrow characterization of the issue]; *Terry, supra,* 131 Cal.App.4th at p. 1547 [same].) Under the circumstance, therefore, the *Du Charme* rule and its "ongoing controversy" requirement are simply inapplicable. (*Fitzgibbons, supra,* 140 Cal.App.4th at p. 524 [*Du Charme* rule not applicable to statements on issues of widespread public interest].)

Even if we viewed Cooper's conversation as a private communication of limited interest to only those living in or moving into the neighborhood, and thus subject to the *Du Charme* rule, we would still conclude that it qualifies for anti-SLAPP protection.[16]

▇▇▇▇ The *Du Charme* rule applies to statements made "in the context of an ongoing controversy, dispute or discussion." (*Du Charme, supra,* 110 Cal.App.4th at p. 119.) Since, as noted, we must broadly construe the

---

None involved statements concerning issues of widespread public interest; and none suggested that that category should be further restricted. On the contrary, when it imposed the "ongoing controversy" requirement, the *Du Charme* court *expressly* limited it to "cases where the issue is not of interest to the public at large." (*Du Charme, supra,* 110 Cal.App.4th at p. 119.) Nevertheless, some courts have uncritically embraced the *Wilbanks* rule despite the lack of analytical justification or pertinent support. (See, e.g., *Hall, supra,* 153 Cal.App.4th 1337, 1347; *Gilbert, supra,* 147 Cal.App.4th at p. 23; *Huntingdon Life Sciences, supra,* 129 Cal.App.4th at p. 1246; but see *Fitzgibbons, supra,* 140 Cal.App.4th at p. 524 [*Du Charme* rule is *not* applicable to statements concerning issues of widespread public interest].)

In our view, the *Wilbanks* rule, which even further narrows the meaning of "public interest," is akin to the rule promulgated in *Zhao v. Wong* (1996) 48 Cal.App.4th 1114 [55 Cal.Rptr.2d 909] (disapproved in *Briggs, supra,* 19 Cal.4th at p. 1124, fn. 10) that narrowed "public issue" to statements "occupying 'the highest rung of the heirarchy [*sic*] of First Amendment values,' that is, to speech pertaining to the exercise of democratic self-government." (*Zhao,* at p. 1122.) As the *Nygård* court explained, the Legislature amended the anti-SLAPP statute to require that it be broadly construed in response to *Zhao.* (*Nygård, supra,* 159 Cal.App.4th at p. 1039.)

[16] Indeed, we would find that it passes muster even under the *Wilbanks* rule. (See fn. 15, *ante.*)

statutory prerequisites for anti-SLAPP protection, we consider it appropriate to broadly construe the judicially created prerequisite of an "ongoing controversy, dispute, or discussion" in order to safeguard the valid exercise of protected activity and further the statute's purpose of encouraging participation in matters of public significance.

 With this in mind, and assuming that there is, in fact, a person who is required to register as a sex offender living across the street, we note that that offender has an ongoing, annual, and lifetime duty to register his or her residence with authorities. (Pen. Code, § 290, subd. (a).) That information is included in a database, which is updated when necessary and published on the ML Web site. (See Pen. Code, § 290.46.) The purpose of that Web site is to provide current and continuous notice of and access to the fact that this registered offender is living in that neighborhood so that its residents, visitors, and potential residents can take whatever measures they deem necessary to maintain vigilance and protect themselves and their children. We find that the continuous access to and dissemination of information about the presence of a registered offender in the area represents ongoing "discussion," albeit a cyber discussion, between local authorities and local residents about that particular offender. In our view, this discussion passes muster under the *Du Charme* rule. Indeed, we believe that Cooper's conversation occurred in the context of "ongoing controversy, dispute or discussion" just as much as the statements during elections in *Macias* and *Damon*. Moreover, Cooper's conversation involved issues that were no less important than the statements in those cases. Thus, it too ought to qualify for anti-SLAPP protection to encourage participation in matters of public significance and safeguard the valid exercise of First Amendment rights.[17]

### B. *Unlawful Activity*

Cross claims that Cooper's threat to disclose and actual disclosure are not protected conduct because they constituted illegal conduct, which is not entitled to anti-SLAPP protection. In particular, Cross argues that the threat amounted to attempted extortion; and the disclosure was an unauthorized use of information on the ML Web site.

### 1. *Applicable Principles*

 Not all speech or acts performed in furtherance of First Amendment rights qualify for anti-SLAPP protection; only *valid* acts qualify. Therefore,

---

[17] Given our conclusion, we need not address the Coopers' further claim that the disclosure of information constituted a matter of public interest because it represented consumer protection information. (See, e.g., *Wilbanks, supra,* 121 Cal.App.4th at pp. 898–899.)

acts that are illegal as a matter of law, such as attempted extortion, are not protected. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 313–317, 328 [46 Cal.Rptr.3d 606, 139 P.3d 2] (*Flatley*).) However, in the context of an anti-SLAPP motion, illegal conduct precludes anti-SLAPP relief only if the defendant effectively concedes that his or her conduct was illegal or there is uncontested evidence that conclusively establishes illegal conduct as a matter of law. (*Id.* at p. 320.) In such narrow circumstances, the defendant simply cannot show that he or she engaged in *valid* conduct in furtherance of protected constitutional rights. (*Id.* at p. 316.)

For example, in *Flatley, supra*, 39 Cal.4th 299, the complaint alleged numerous causes of action, including extortion, and the defendant filed an anti-SLAPP motion to dismiss. (*Id.* at p. 305.) Uncontradicted and uncontested evidence showed that the defendant wrote letters and made calls that, when taken together, threatened to accuse the plaintiff of a variety of crimes and disgrace him in the public media unless he paid a large sum of money. Under these circumstances, the evidence conclusively established criminal extortion as a matter of law. (*Id.* at pp. 328–330; see Pen. Code, §§ 518, 519 [proscribing and defining extortion].) Accordingly, the extortion claim was not subject to dismissal under the anti-SLAPP statute. (*Flatley, supra*, 39 Cal.4th at p. 333.) The *Flatley* court emphasized, however, that its conclusion that the defendant's conduct "constituted criminal extortion as a matter of law [was] based on the specific and extreme circumstances of this case." (*Id.* at p. 332, fn. 16.)

As another example of unprotected illegal conduct, the *Flatley* court cited *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 [102 Cal.Rptr.2d 864] (*Paul*), disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th 53, 68, footnote 5. In *Paul*, the complaint alleged that the defendants interfered with the plaintiff's candidacy by making illegal campaign contributions to an opponent. The defendants moved to dismiss under the anti-SLAPP statute. (*Paul, supra*, 85 Cal.App.4th at pp. 1361–1362.) However, the defendants' own moving papers effectively conceded that their laundered campaign contributions violated the law. Thus, the court concluded as a matter of law that the defendant could not show that their money laundering conduct was constitutionally protected even though it was undertaken in connection with making political contributions. (*Id.* at p. 1365.) As in *Flatley*, the *Paul* court emphasized the narrow circumstances in which a defendant's assertedly protected activity could be found to be illegal as a matter of law. "In order to avoid any misunderstanding as to the basis for our conclusions, we should make one further point. This case, as we have emphasized, involves a factual context in which defendants have effectively conceded the illegal nature of their election campaign finance activities for which they claim constitutional protection. Thus, there was *no dispute* on the point and we have concluded,

as a matter of law, that such activities are *not* a valid exercise of constitutional rights as contemplated by section 425.16. However, had there been a factual dispute as to the legality of defendants' actions, then we could not so easily have disposed of defendants' motion. [¶] As we have noted, a defendant need only make a prima facie showing that the plaintiff's suit arises 'from any act of [the defendant] in furtherance of [the defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue.' [Citation.] If the plaintiff contests this point, and unlike the case here, cannot demonstrate as a matter of law that the defendant's acts do not fall under section 425.16's protection, then the claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise and support in the context of the discharge of the plaintiff's burden to provide a prima facie showing of the merits of the plaintiff's case." (*Paul, supra*, 85 Cal.App.4th at p. 1367, first italics added; accord, *Flatley, supra*, 39 Cal.4th at p. 317.) Conversely, in meeting the initial burden, the defendant need not show as a matter of law that his or her conduct was legal. (*Soukup v. Law Offices of Herbert Hafif, supra*, 39 Cal.4th at p. 286.) Thus, if a plaintiff claims that the defendant's conduct is illegal and thus not protected activity, the plaintiff bears the burden of conclusively proving the illegal conduct.

## 2. *Extortion*

Although the complaint did not expressly assert a cause of action for attempted extortion, Cross argued that the allegations in her claim for breach of the covenant of good faith implicitly did so. Specifically, the complaint alleged, in pertinent part, that the Coopers unfairly interfered with her right to the benefits of the lease by telling her she could not put up a "For Sale" sign or show the property and threatening to remove any sign and threatening to make "negative comments regarding THE PROPERTY to any prospective purchasers including things [the Coopers] claimed would make the property impossible to sell." Cross further alleged that that the Coopers "demanded conditions for allowing THE PROPERTY to be shown, which included [their] being allowed to occupy [it] during August, 2007 rent free. If plaintiff would not agree to said conditions, [the Coopers] threatened to state negative comments to actual or prospective purchasers regarding THE PROPERTY. Said comments would include describing the proximity of convicted sex offenders. If plaintiff would agree to said conditions, no such comments would be made."

In opposition to the anti-SLAPP motion, Cross stated the factual basis of her allegations. She submitted a series of e-mails that Cooper sent her. Although he initially said the house could not be shown until they vacated it, he later said he would maintain the house in show condition and allow it to

be shown on Tuesdays if Cross provided 48-hours' notice, waived rent for August, and promised to return their deposit immediately after the walk-through. In a later e-mail, Cooper reiterated that he would cooperate with showings on Tuesdays. He further said that he would not guarantee cooperation on other days nor promise not to express his opinion about the value of the house or the recent visit by police to the nearby house of the sexual offender. And in two subsequent e-mails, Cooper again promised to fully cooperate with showings on Tuesdays. In her declaration, Cross stated that she believed Cooper was threatening to tell prospective buyers that a registered offender lived nearby unless she waived rent for August or increased his property rights.

As noted, the trial court found that the complaint alleged that the Coopers "attempted to extort one month's free rent from [Cross]." However, the evidence before the trial court did not conclusively establish attempted extortion as a matter of law.

Cooper did not concede that the e-mails to Cross amounted to attempted criminal extortion. On the contrary, he contested Cross's claim and the purported factual basis for it, arguing that the e-mails did not constitute a threat of any sort; there was no evidence they intended to extort anything from Cross; and, because the location of the registered offender was public information, its threatened disclosure could not constitute attempted extortion based on the threat to disclose a secret.

Not only did Cooper not concede criminal conduct, but we do not find this to be one of those rare cases in which there is uncontroverted and uncontested evidence that establishes the crime as a matter of law. (E.g., *Flatley, supra,* 39 Cal.4th 299; *Cohen v. Brown* (2009) 173 Cal.App.4th 302 [93 Cal.Rptr.3d 24] (*Cohen*) [undisputed evidence conclusively established that the alleged protected conduct constituted extortion as a matter of law].)

Penal Code section 518 defines extortion and section 524 proscribes attempted extortion.[18] As pertinent here, the elements of attempted extortion are (1) a specific intent to commit extortion—i.e., to obtain property from another, with his or her consent, induced by a wrongful use of fear and (2) a

---

[18] Penal Code section 518 provides, "Extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."

Penal Code section 524 provides, "Every person who attempts, by means of any threat, such as is specified in Section 519 of this code, to extort money or other property from another is punishable by imprisonment in the county jail not longer than one year or in the state prison or by fine not exceeding ten thousand dollars ($10,000), or by both such fine and imprisonment."

direct but ineffectual act done towards its commission. (*People v. Umana* (2006) 138 Cal.App.4th 625, 638–639 [41 Cal.Rptr.3d 573]; *People v. Sales* (2004) 116 Cal.App.4th 741, 749 [10 Cal.Rptr.3d 527].) "Fear, such as will constitute extortion, may be induced by a threat, either: [¶] 1. To do an unlawful injury to the person or property of the individual threatened or of a third person; or, [¶] 2. To accuse the individual threatened, or any relative of his, or member of his family, of any crime; or, [¶] 3. To expose, or to impute to him or them any deformity, disgrace or crime; or, [¶] 4. *To expose any secret affecting him or them.*" (Pen. Code, § 519, italics added.)

Clearly, the e-mails that Cooper sent to Cross did not threaten to physically harm anyone or any property, accuse anyone of a crime, or expose or impute to Cross some deformity or disgrace. Moreover, they did not, as a matter of law, explicitly or implicitly threaten to disclose the location of the registered offender unless Cross complied with his demands. And neither they nor Cross's declaration conclusively establish that the e-mails were adapted to convey that message. The fact that Cross inferred as much and believed they conveyed an extortionate message does not establish that message or Cooper's intent to convey it as a matter of law.

Furthermore, the record does not establish as a matter of law that the location of the registered offender was the sort of "secret" which the threatened disclosure would constitute extortion within the meaning of Penal Code section 519.

"The 'secret' referred to in the statute is a matter 'unknown to the general public, or to some particular part thereof which might be interested in obtaining knowledge of the secret; the secret must concern some matter of fact, relating to things past, present or future; the secret must affect the threatened person in some way so far unfavorable to the reputation or to some other interest of the threatened person, that threatened exposure thereof would be likely to induce him through fear to pay out money or property for the purpose of avoiding the exposure.' [Citation.] Whether a threatened exposure would have this effect on the victim is a factual question and depends on the nature of the threat and the susceptibility of the victim. [Citations.]" (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1078 [267 Cal.Rptr. 457], quoting *People v. Lavine* (1931) 115 Cal.App. 289, 295 [1 P.2d 496]; see *People v. Peniston* (1966) 242 Cal.App.2d 719, 722–723 [51 Cal.Rptr. 744]; *People v. Fox* (1958) 157 Cal.App.2d 426, 430 [321 P.2d 103].)

Here, information that the offender lived in the neighborhood was publicly available on the ML Web site to anyone who was interested in knowing about it, and Cross's own pleadings and declarations established that she and some

of her neighbors knew this information. Moreover, Cross essentially concedes that she had a duty to disclose to any potential buyer, renter, or lessee the existence of the ML Web site containing information about registered sex offenders who might be living in the area, and she admitted disclosing the Web site in the contract of sale with the Chans. Under the circumstances, the record does not conclusively prove that the location of the offender was a matter so unfavorable to Cross's interests or that she so feared its disclosure that she would waive her right to collect rent for August. Indeed, in her opposition to the anti-SLAPP motion, Cross opined that "[the offender] was not a threat and his presence was not a material factor in regard to her property."

Finally, that Cross may have believed the information to be secret at least to part of the population or that she wanted to keep it a secret if possible does not conclusively establish that it was a secret for the purpose of attempted extortion. Rather, whether the location of the offender was a secret represented a contested question of fact.

Cross's reliance on *Cohen, supra,* 173 Cal.App.4th 302 is misplaced. There, the plaintiff and the defendant were attorneys who had worked together on a case. The attorneys had a dispute over splitting fees in the case. The defendant attorney threatened to file a complaint with the California State Bar if the plaintiff attorney did not agree to endorse a settlement check for the case. Later, the defendant attorney filed a false and fraudulent complaint with the State Bar. The plaintiff sued the defendant alleging, among other things, that the defendant filed the State Bar complaint to extract concessions from him concerning the fee. (*Id.* at pp. 306–311.) The court denied the defendant anti-SLAPP protection because the record established extortion as a matter of law and also conclusively refuted the defendant's assertion that the State Bar claim was filed in good faith. (*Id.* at pp. 317–318.)

*Cohen* is distinguishable and does not suggest that here Cross satisfied her burden to conclusively establish that Cooper committed attempted extortion. On the contrary, the record establishes that most, if not all, elements of such an offense are contested issues of fact.

### 3. *Unlawful Use of Information*

Most of Cross's causes of action are based on Cooper's disclosure to the agent that the registered offender lived across the street, a disclosure that Cooper concedes he made. In support of her argument that the disclosure was

unlawful and therefore not entitled to anti-SLAPP protection, Cross cites the provisions of Megan's Law, and in particular Penal Code section 290.46 (hereafter section 290.46).

Section 290.46 requires the Department of Justice to maintain a Web site that includes information on persons convicted of specified sex offenses, such as the offender's name, address, aliases, photograph, physical description, date of birth, criminal history and other information the department deems relevant. (§ 290.46, subds. (a)(1), (b)(1), (c)(1), (d)(1).) Section 290.46 further provides, "(*l*)(1) A person is authorized to use information disclosed pursuant to this section *only* to protect a person at risk. [¶] (2) Except as authorized under paragraph (1) or any other provision of law, use of any information that is disclosed pursuant to this section for purposes relating to any of the following is prohibited: [¶] (A) Health insurance. [¶] (B) Insurance. [¶] (C) Loans. [¶] (D) Credit. [¶] (E) Employment. [¶] (F) Education, scholarships, or fellowships. [¶] (G) Housing or accommodations. [¶] (H) Benefits, privileges, or services provided by any business establishment. [¶] . . . [¶] (4)(A) Any use of information disclosed pursuant to this section for purposes other than those provided by paragraph (1) or in violation of paragraph (2) shall make the user liable for the actual damages, and any amount that may be determined by a jury or a court sitting without a jury, not exceeding three times the amount of actual damage, and not less than two hundred fifty dollars ($250), and attorney's fees, exemplary damages, or a civil penalty not exceeding twenty-five thousand dollars ($25,000)." (Italics added.)

Penal Code section 290.46, subdivision (j) provides: "(1) Any person who uses information disclosed pursuant to this section to commit a misdemeanor shall be subject to, in addition to any other penalty or fine imposed, a fine of not less than ten thousand dollars ($10,000) and not more than fifty thousand dollars ($50,000). [¶] (2) Any person who uses information disclosed pursuant to this section to commit a felony shall be punished, in addition and consecutive to any other punishment, by a five-year term of imprisonment in the state prison."[19]

Cross claims that Cooper's disclosure of the offender's location constituted an unauthorized use of information because there is no evidence that it was disclosed "to protect a person at risk." (Pen. Code, § 290.46, subd. (*l*)(1).) She argues that neither she nor the Coopers could identify a specific person

---

[19] The Department of Justice's ML Web site, which the trial court took judicial notice of, informs persons accessing it that "[t]he information on this web site is made available solely to protect the public. Anyone who uses this information to commit a crime or to harass an offender or his or her family is subject to criminal prosecution and civil liability." (See <http://www.meganslaw.ca.gov/disclaimer.aspx?lang=ENGLISH> [as of July 11, 2011].)

who was at risk. Although Cooper declared that he disclosed the information to the agent because the prospective buyer "may have children," Cross argues that "[a] maybe person is also a maybe not person, or an adult child, or doesn't live with the buyer."

Initially, we note that in *Mendoza, supra,* 182 Cal.App.4th 1644, the plaintiff made a similar claim that the private disclosure of information from the Web site was illegal under Penal Code section 290.46 because it was not disclosed to protect a person at risk. Thus, because the disclosure was unlawful, it did not qualify for anti-SLAPP protection. (182 Cal.App.4th at p. 1653.) The court rejected this claim.

The court concluded that in *Flatley, supra,* 39 Cal.4th 299, the Supreme Court's repeated use of the word "illegal" (*id.* at p. 320) in referring to conduct that did not qualify for anti-SLAPP protection was intended to mean conduct that was "criminal, and not merely violative of a statute." (*Mendoza, supra,* 182 Cal.App.4th at p. 1654.) The court explained, "First, the court in *Flatley* discussed the attorney's underlying conduct in the context of the Penal Code's criminalization of extortion. Second, a reading of *Flatley* to push any statutory violation outside the reach of the anti-SLAPP statute would greatly weaken the constitutional interests which the statute is designed to protect. As [the defendant] correctly observes, a plaintiff's complaint *always* alleges a defendant engaged in illegal conduct in that it violated some common law standard of conduct or statutory prohibition, giving rise to liability, and we decline to give plaintiffs a tool for avoiding the application of the anti-SLAPP statute merely by showing any statutory violation." (*Ibid.*)

The court further noted that although Penal Code section 290.46, subdivision (j) increases the punishment for a misdemeanor or felony if the perpetrator uses information to commit the offense, that section does not define a substantive crime but is essentially only an enhancement statute. Thus, even a violation of that subdivision does not constitute "illegal"—i.e., criminal—conduct under *Flatley* for purposes of anti-SLAPP analysis. (*Mendoza, supra,* 182 Cal.App.4th at p. 1655.)

Thus, here, even if Cross conclusively demonstrated that Cooper's disclosure was unauthorized as a matter of law, under *Mendoza,* that unauthorized, but noncriminal, conduct would not preclude anti-SLAPP protection. Here, however, Cross fails to conclusively demonstrate that Cooper's disclosure was unauthorized as a matter of law.

Penal Code section 290.46, subdivision (*l*) allows the use of information on the ML Web site "to protect a person at risk," that is, *for the purpose of* protecting a person at risk, and prohibits its use for any other

purposes. Thus, the propriety of the use depends on whether the use was intended to protect a person at risk.[20]

Here, Cooper's intent constitutes a contested issue of fact. He declared that he disclosed the offender's location because the agent of the prospective buyers said that the buyers might have children and because of the risk to children posed by a nearby registered offender. Cross does not conclusively refute Cooper's declaration. She merely argues that the evidence supports a finding that Cooper had an ulterior motive and purpose in disclosing the information: to make the house unsellable.

We also reject Cross's claim that in the absence of a specific, identifiable person who is in fact at risk, the disclosure of information, even if ostensibly for the purpose of protection, is nevertheless unauthorized. We doubt the Legislature intended such a narrow and cramped interpretation because the purpose of the registration law and the blanket dissemination of registration information through the ML Web site is to facilitate and enhance the protection and safety of those living in proximity to registered offenders. Making the existence of a specific, identifiable person at risk a prerequisite to authorized use of information limits, rather than promotes, the purpose of the statute and Web site. Moreover, such a requirement would not necessarily prevent the harassment of registered offenders from misuse of information for the unauthorized purposes enumerated in the statute. In our view, the statute authorizes disclosure not only when one provides the information to a mother who is standing in front of her house with a small child in her arms but also where one provides information with a reasonable and good faith belief that doing so will help protect another person and intending that the information do so.

## V. Conclusion

To summarize our analysis and discussion, we conclude that Cooper satisfied the initial burden to show that the challenged causes of action in Cross's complaint arose from acts in furtherance of Cooper's right of free speech in connection with an issue of public interest. (§ 425.16, subds. (b)(1), (e)(4); *Mendoza, supra,* 182 Cal.App.4th 1644.) We further conclude that

---

[20] In this regard, we note that "[w]hen the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. *When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.*" (*People v. Hood* (1969) 1 Cal.3d 444, 456–457 [82 Cal.Rptr. 618, 462 P.2d 370], italics added; accord, *People v. Rubalcava* (2000) 23 Cal.4th 322, 328 [96 Cal.Rptr.2d 735, 1 P.3d 52].)

Cross failed to conclusively establish that Cooper's acts were illegal as a matter of law and, therefore, not entitled to anti-SLAPP protection. Accordingly, the trial court's order cannot stand.

Because the court concluded that the Coopers had not met their initial burden, it did not reach the question of whether Cross could show a probability of success on any of the challenged causes of action. Nor did the court rule on the Coopers' numerous objections to the evidence Cross submitted to satisfy her burden.

Under identical circumstances, the court in *Hall, supra,* 153 Cal.App.4th 1337 opined, "Rulings on the evidentiary objections are necessary before the trial court or this court can determine whether [the plaintiff] has presented admissible evidence that demonstrates a probability of prevailing on the merits of her claims. Rulings on evidentiary objections involve an exercise of discretion, and it is the trial court's responsibility to rule on the objections in the first instance. [Citations.] Although the trial court's failure to rule on the objections is understandable in light of its conclusion, the trial court on remand must rule on the evidentiary objections and then decide whether [the plaintiff] has demonstrated a probability of prevailing on the merits of her claims. [Citation.]" (*Id.* at pp. 1347–1348, fn. omitted; accord, *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 286 [67 Cal.Rptr.3d 190]; but see *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 656 [24 Cal.Rptr.3d 619] [reviewing court should rule on evidentiary objections in the first instance].) We agree with the *Hall* court's approach and shall remand the matter for further proceedings on the anti-SLAPP motion.[21]

## VI. DISPOSITION

The order denying the anti-SLAPP motion is reversed. The matter is remanded to the trial court for further proceedings on the motion, including ruling on evidentiary objections and determining whether Cross has met her burden to show a probability of success on the merits of the challenged causes of action.

---

[21] Given our conclusion and disposition, we need not address the myriad additional issues, claims, and arguments raised by both parties in their briefs. In particular, we need not address Cooper's claim that the trial court abused its discretion in declining to take judicial notice of certain materials. Nor need we grant Cooper's request that we take judicial notice of the record in Cross's prior petition for a writ of mandate. We also need not address claims and arguments concerning the litigation privilege. (Civ. Code, § 47, subd. (b).)

Finally, we note that Cross filed a motion for sanctions against the Coopers for filing this appeal and the Coopers made a motion to strike Cross's respondent's brief or portions of it. We deferred ruling on the motion to strike and ordered that it be considered with the appeal. By separate orders, we dispose of both motions.

Cooper is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied August 4, 2011, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied October 12, 2011, S195859.