Filed 3/20/14  P. v. Oliver CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>IVAN GARCIA OLIVER,<br><br>      Defendant and Appellant. | A136432<br><br>(Lake County<br>Super. Ct. No. CR914443) |

Defendant Ivan Garcia Oliver was convicted by a jury of the first degree murder of Michael Dodele on November 20, 2007, with use of a knife (Pen. Code, § 12022, subd. (b)(1)), and information derived from the Megan's Law Web site (Pen. Code, § 290.46, subd. (j)(2)).[1]  He was sentenced to 25 years to life for the murder, plus one year for using the knife, five years for using Megan's Law information, and one year for a prior prison term (§ 667.5, subd. (b)).  He argues that the Megan's Law enhancement finding must be reversed for instructional error and insufficient evidence.  We disagree and affirm the judgment.

## I.  BACKGROUND

Oliver and Dodele were neighbors in a mobile home park.  Oliver lived in the park with his girlfriend and their four-year-old son.  Dodele moved into a nearby trailer less than a month before the murder.

---

[1]All further statutory references are to the Penal Code.

1

Mobile home park manager Lacey Kou testified that, two or three days before the murder, Oliver told her that he was concerned for the safety of children in the complex. Oliver testified that he told Kou that he saw someone in a parked car trying to get his son's attention, and that the car sped off when Oliver approached. Kou told Oliver that they could learn whether registered sex offenders lived in the area by going to the Megan's Law Web site. Section 290.46, commonly known as "Megan's Law," requires the Department of Justice to maintain a public website with information about registered sex offenders. (*Doe v. Brown* (2009) 177 Cal.App.4th 408, 419–420.)

Oliver testified that he did not know how to use computers, but he sat next to Kou when she accessed the Megan's Law Web site. He said she pulled up a map of Lake County with "a bunch of little red blips, like little balloons, like all over the county." She went to another page showing the area where they lived, and pulled up people's names by clicking on the balloons. Another page showed photos, names, and addresses of sex offenders in their area, one of whom was Dodele. She printed a two-page document with information about Dodele and others and gave it to Oliver. She told Oliver that Dodele was a child molester. Kou testified that the website listed Dodele's crimes as rape and "forced oral copulation on a child under 14," or words to that effect, which upset Oliver. Oliver denied that he saw the webpage that specified Dodele's crimes.

Dodele was in fact a serial rapist, not a child molester, whose long record of offenses against adult women, usually involving threats with knives, was put into evidence in Oliver's defense. Dodele had been in prison for close to 20 years, and was released about two months before Oliver killed him. Kou could understandably have believed that Dodele was a child molester given how his crimes were described on the Web site. The crimes were identified as "rape by force," and "*oral copulation with person under 14*/etc or by force/etc." (Italics added; capitalization deleted.)

Kou's mother, Lena Wilson, also looked at the Megan's Law Web site. She concluded only that Dodele "*could* have been a child molester." (Italics added.) Wilson testified that she told Oliver that Dodele might not be a child molester, but Oliver said

that "[h]e didn't like sex offenders at all, child molesters or otherwise," and that "[a]ll of them need to be done away with."

Kou said that she and Oliver decided they would inform the park's residents of the risk posed by Dodele, and that Oliver would talk to the residents who spoke Spanish. Oliver then went on what Wilson called "a rampage," "trying to round up a posse with the other tenants" to have Dodele evicted. Wilson left a voice mail message at the sheriff's department saying, "look, we have a situation here. We have one tenant who's angry at another tenant . . . because he has a child and the other guy is supposedly a child molester. I think it's going to escalate." She left a later message saying that Oliver was "getting more irate. We need a response from someone to let us know if [Dodele] can be here legally."

Barry Durnal, a resident at the park, testified that Oliver came to his home a few days before the murder and showed him a photo of Dodele he said he had obtained from the internet. Oliver said that Dodele was a child molester and told Durnal to watch out for him. Another park resident, Alma Carrillo, testified that Oliver came to her home two days before the murder, told her that Dodele was a child molester, and advised her to check the Megan's Law Web site.

Oliver testified that no one seemed to care when he warned them about Dodele and it made him "very upset. Very broken hearted. I felt alone." Park resident Henry Smith testified that Oliver came to his home two to four days before the murder "acting all violent," and asked Smith if he was a child molester.

Silvia Bojorquez, who lived near Oliver, said that Oliver asked to speak to her son Israel on the morning of the murder. Israel, who identified as "Monica" at trial, said that Oliver attacked her when she went to Oliver's home, hitting her in the face, knocking her down, and kicking her in the back. Oliver denied assaulting Israel, but testified that he knew Israel wanted to be a girl, and that he told Israel, "you're a creep and I don't want you around my son."

Oliver testified that he went to Dodele's home to retrieve his painting equipment which Dodele had borrowed from Kou's husband. But in one of his interviews with

3

police after the killing he admitted that he had "murder" on his mind when he went to Dodele's home.  In another interview he said, "Fuck, I'm guilty . . . .  I killed that dude man.  He touched my son, I killed him man.  Alright?  That dude's in hell, I killed him."  Oliver testified that, more than a week before the murder and before he learned of Dodele's past, his son told him that he had played "touching the Pee Pee" with the "old man."  Oliver said that after Dodele let him into his trailer, he heard a voice inside his head saying "Ask him, ask him, ask him, ask him."

Oliver told Dodele that his son said Dodele had tried to fondle his penis.  Dodele responded,  "What the fuck are you saying?  You don't know what you're fucking talking about. . . . I'm going to fucking kill you."  Dodele took out a knife and tried to stab Oliver.  Oliver, who was 29 years old, struggled with 67-year-old Dodele. Dodele cut Oliver's hand, and Oliver took the knife away.  Oliver said he stabbed Dodele with the knife, "[a]nd then after a while I noticed that he was on the ground and that the fight was over and that he was no longer living."  Dodele died from 65 stab wounds.

When Oliver was being transported from court with other inmates to jail following his arrest, he stepped out of line and slammed another inmate, who was a sex offender, against a wall.  The supervising correctional officer testified that he asked Oliver, "you really don't like those 290 [the sex offender registration statute] guys, do you?"  Oliver answered:  "Have you ever seen anything or heard anything that makes you sick in your guts, that's how I feel when I see a 290.  Those guys are wrong."

## II.  DISCUSSION

A. Jury Instructions

Oliver argues that the instructions on the Megan's Law enhancement were deficient because the jury was not required to find that he personally acquired information from the Web site in connection with Dodele's murder.

Section 290.46, subdivision (j)(2) provides:  "Any person who uses information disclosed pursuant to this section to commit a felony shall be punished, in addition and consecutive to any other punishment, by a five-year term of imprisonment . . . ."  There is no standard instruction on this enhancement, and the reported cases construe it in the

4

context of anti-SLAPP motions and are not pertinent to our discussion. (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 389–390; *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1655.)

The jury was instructed that the enhancement allegation "requires general criminal intent . . . . [¶] For you to find the allegation true, that person must not only commit the prohibited act but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act." The jury was further instructed: "If you find the defendant guilty of the crimes charged in Counts 1 [murder], 2 [burglary] or 3 [elder abuse], or the lesser crime of voluntary manslaughter, you must then decide whether for each crime the People have proved the additional allegation that the defendant used information disclosed on the Megan's Law Web site, pursuant to Penal Code section 290.46 to commit a felony. [¶] To prove this allegation the People must prove that: [¶] One, the defendant acquired information on the Megan's Law Web site about Michael Dodele; [¶] And two, the defendant used that information to commit a felony against Michael Dodele."

The prosecutor told the jury in closing argument that "the defendant acquired information on the Megan's Law Web site about the victim. . . . He saw his name on there. He saw his address on there. He acquired that information to determine where he lived. And then he took that information and he used that information to commit a felony against the victim . . . . And murder, voluntary manslaughter, burglary and elder abuse are all felonies. [¶] So if you find the defendant guilty of any of those crimes charged . . . the allegation that he misused the sex offender information should be pretty simple." Defense counsel did not address the Web site enhancement other than to state, "it's [Kou's] idea to go on the Megan's Law Web site, an important fact."

Oliver argues that a defendant must personally access the Megan's Law Web site and acquire the information in order to be liable for the enhancement because "the plain intent of the statute is to deter persons from going to the Web site to acquire information about sex offenders that can then be used to harm them. There would be no deterrent effect if the defendant did not personally acquire the information from the Web site, but

5

gained his knowledge from an independent source. To hold a defendant criminally responsible for using information he did not acquire, and may not have known the source of, is not the legislative intent, and would be an absurd and unjust result." Oliver posits that "if A tells B that C is a sex offender, and B assaults C because of that, B's punishment for felony assault should not be increased because A learned of C's criminal record from the Megan's Law Web site." He argues that his interpretation is supported by "the rule of lenity" because "[i]t is reasonable to conclude the Legislature intended the enhancement to apply only when the person uses information that he personally and knowingly obtained from the Web site."

The People counter that the objective of the statute is to punish anyone who misuses information from the Web site, including those who acquire the information from another source.

There was no instructional error. Oliver argues in effect that the enhancement applies only to those who are sufficiently skilled with computers to personally research the Megan's Law Web site. We do not believe the enhancement is so limited. We agree with the People that liability can be imposed for misuse of Megan's Law Web site information even if the information is obtained from a third party, subject to the important qualification that the defendant is aware that the Web site was the source of the information. While the instructions on this qualification could have been more explicit, the court's instruction on general intent was sufficient to ensure that the qualification would be applied here because Oliver could not be found to have "intentionally [done the] prohibited act" of using information from the website unless he knew that the information came from that source.

In any event, the evidence showed that Oliver personally and knowingly obtained information from the Web site. He and Kou went online and viewed the Web site together. He knew that the printout that he received from Kou and showed to residents in the trailer park came from the Web site. Thus, even if the court had erred in failing to instruct that Oliver had to personally acquire information from the Web site, the error would have been harmless under any standard.

6

B.  Substantial Evidence

Oliver argues that he could not be found to have "used" information from the Megan's Law Web site in connection with Dodele's murder because the information he derived that Dodele was a child molester came from Kou, not the Web site, and the information was incorrect.  However, as we have said, it is immaterial that Kou conveyed the information because Oliver knew that she obtained it from the Web site.  Nor are we persuaded that information on the Web site can be misused only if it is correctly interpreted.  It is sufficient here that Oliver's belief about what the Web site disclosed could reasonably be found to have influenced his decision to murder Dodele.

## III.  DISPOSITION

The judgment is affirmed.

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.

7