Filed 2/8/16  Hebert v. Getty Images CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PAUL HEBERT, | B255762 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC521427) |
| v. | |
| GETTY IMAGES (US), INC., et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steven J. Kleifield, Judge.  Affirmed.

Davis Wright Tremaine, Kelli L. Sager and Dan Laidman for Defendants and Appellants.

Mancini & Associates, Marcus A. Mancini, Christopher M. Barnes; Benedon & Serlin, Gerald M. Serlin and Wendy S. Albers for Plaintiff and Respondent.

**INTRODUCTION**

Plaintiff and respondent Paul Hebert, a professional celebrity photographer, sued defendants and appellants Getty Images US, Inc. (Getty) and Karl Walter for defamation and for intentional infliction of emotional distress after defendants sent two e-mails to people in the industry about Hebert's allegedly unprofessional conduct. Defendants brought a special motion to strike Hebert's complaint as a strategic lawsuit against public participation (a SLAPP suit). (Code Civ. Proc., § 425.16.)[1] The trial court denied the motion, finding that although the e-mails concerned a matter of public interest, Hebert demonstrated a probability of prevailing. Defendants appeal. We conclude that because Hebert's causes of action do not arise from conduct "in connection with a public issue or an issue of public interest" the motion was properly denied. (*Id*., subd. (e).) We therefore affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      Factual background.**

Hebert is a professional photographer who covers red carpet events; for example, film premieres and awards shows. In 2012, he worked freelance for Getty, as well as another company, InVision. Walter was Getty's "Director, Editorial Photography."

After Getty's and Hebert's working relationship ended in early August 2013, Hebert e-mailed Walter on August 13, 2013, expressing regret and explaining that the "past month has been one of mixed emotions for me." Hebert said he made a "hasty decision and was looking for an easy way out," which cost him what he loved most, working at Getty. Walter responded, "hope it works out for you despite the Iago's in your ear. Photography is a hard game, but you're a good shooter. Good luck."

Walter thereafter received information from one its freelance photographers, Imeh Akpanudosen, that at a recent movie event Hebert "suddenly pushed" Akpanudosen and moved in front of Akpanudosen to get a better position for his shot. Hebert was also

---

[1]      All undesignated statutory references are to the Code of Civil Procedure.

badmouthing Getty. Akpanudosen attended several events where Hebert stood or placed his bag on spots marked for photographers from other agencies.

Walter then, on August 21, 2013, sent this e-mail to six managers at InVision: "Hello friends at InVision, [¶] Wanted to give you some information that I found troubling with regards to your photographer Paul [Hebert] during a recent event. When Getty stopped working with Paul, the chip he had on his shoulder got bigger. During a recent event, that chip turned physical, and he aggressively laid hands on one of our photographers. [¶] I expect that this sort of behavior is not tolerated by the AP or InVision, and hope that you will communicate that to him."

That same day, Walter sent this e-mail to "a list of regular Getty Images freelance photographers": "Hello all, [¶] I wanted to let you know that photographer Paul Herbert [*sic*] is no longer affiliated with our team. Please be aware that he can be aggressive both emotionally and physically, and might try to tamper with your marked spot on the arrivals line in order to obtain a better position for himself. [¶] Please let me know if you have any trouble with him at any of your events."

## II. Procedural background.

### A. *The complaint.*

On September 13, 2013, Hebert sued Getty and Walter for defamation and for intentional infliction of emotional distress.[2] Hebert alleged he works in "a business where attitude, non-violence, stability, being level-headed, accepting and submitting to direction and integrity were not only valued but imperative." The e-mails imputed that Hebert "lacks judgment and engages in conduct" "wholly inappropriate and incompatible with" his position and occupation.

### B. *Getty's and Walter's special motion to strike.*

Getty and Walter filed a special motion to strike on the grounds the e-mails were protected speech involving a matter of public interest, namely, the behavior of

---

[2] Hebert amended his complaint to name Jerod Harris and Akpanudosen.

3

photographers who specialize in photographing celebrities. Defendants also argued that Hebert could not demonstrate a probability of prevailing on the merits, because the common interest privilege in Civil Code section 47, subdivision (c), barred the causes of action and because the e-mails were nonactionable expressions of opinion.

The motion was supported by the declarations of Walter, Akpanudosen, Jerod Harris, Amanda Edwards, and Araya Diaz.

1.      Walter's declaration.

Walter was responsible for the team that manages and assigns photographers to cover entertainment events. In 2013, Phanita Yaganti became Hebert's primary contact at Getty for assignments. Walter began to hear from other Getty editors and photographers that Hebert was unhappy working with Yaganti, about whom Hebert made sexist and racist comments. Walter also heard that Hebert threatened another photographer, Harris, with a bat. Walter was unsure how seriously to take these reports, but, when Hebert ended his relationship with Getty in early August 2013, Walter made no further effort to get Hebert to stay.

After getting an e-mail from Akpanudosen on August 21 informing him that Hebert was "badmouthing" Getty, Walter called Akpanudosen, who told Walter that Hebert pushed Akpanudosen at an event. Akpanudosen was worried that Hebert was creating an uncomfortable and potentially unsafe working environment. Concerned about protecting Getty's reputation and the safety of its photographers, Walter sent the August 21, 2013 e-mails.

2.      Akpanudosen's declaration.

Akpanudosen was a freelance photographer for Getty. On August 13, 2013, Akpanudosen was photographing a movie event. Hebert "suddenly pushed" Akpanudosen and moved in front of him to get a better position for his shot. Akpanudosen "had to brace myself to keep my body from slamming into the stage." At another event on August 20, Hebert said "negative things about Getty and its employees," for example, that "Getty treats its photographers like crap." Hebert also used "profanity

4

and sexist, derogatory language to insult" Yaganti, who had supervised Hebert at Getty. Akpanudosen attended several events where Hebert stood or placed his bag on spots marked for photographers from other agencies. This happened to Akpanudosen at an event in July 2013.

Akpanudosen conveyed his concerns about Hebert to Getty on August 20, 2013. The next day, August 21, Akpanudosen e-mailed Walter, informing him that Hebert was "badmouthing" Getty to other photographers and publicists. "I overheard [Hebert] saying Getty treats their photogs like crap and that's why he's working for a company that treats him like a human being (Invision – his words). Not sure why he's jaded but I don't want it getting in the way of my job and livelihood because someone is talking crap on the carpet and to publicists. Not sure if there's anything that could be done like mentioning it to the Invision higher ups but I just wanted to let you guys know that I've seen this happen a few times before and now it's getting to be a problem." Walter called Akpanudosen, who told Walter about the shoving incident earlier in the week and that Hebert was taking other photographers' designated spots at events.

> 3. Harris's declaration.

Harris is a freelance photographer for Getty. While at a music festival in April 2013, Hebert told Harris that "[Hebert] had a Louisville Slugger baseball bat in the trunk of his car and he would have no trouble using it on me." Hebert also used crude and vulgar language to describe Yaganti, and he said, " 'fuck that bitch.' " Hebert made derogatory comments about Yaganti's race.

> 4. Diaz's declaration.

Diaz, a photographer, was at an event on June 9, 2013. Hebert called Yaganti an " 'Indian bitch' " and said he hoped she got into a car crash and would get cancer and die.

> 5. Amanda Edwards's declaration.

Edwards is a freelance photographer for Getty. On August 13, 2013, she was at a movie event. She saw Akpanudosen, who told her about a physical altercation he had with Hebert.

6.    Request for judicial notice.

Getty requested judicial notice of news articles about encounters between paparazzi and celebrities and of legislation prompted by harassment of celebrities by paparazzi.

C.    *Hebert's opposition to the special motion to strike.*

1.    Hebert's declaration.

Hebert submitted his declaration in opposition to the motion. While working freelance for Getty, he worked for other clients, including InVision. In November 2012, Matt Cowan at Getty told Hebert that Getty was unhappy Hebert covered events for InVision. InVision was a sore spot for Getty, because InVision was founded by former Getty people. Cowan wanted to do anything possible to hurt InVision. Walter looked at InVision's website everyday to see what events it was covering, and it upset Walter to see Hebert's name on one of the InVision events.

Hebert had another meeting with Cowan, Walter, and Yaganti in July 2013. They were upset he had photographed an event in San Diego for InVision. Walter was "very aggressive and verbally abusive" and "threatened" Hebert "by telling me that I could either photograph for Getty exclusively, or I was never permitted to shoot for Getty again." Hebert wanted to stay with Getty, but he needed to take outside jobs as well. When Hebert told Walter that he'd made commitments to InVision, Walter "yelled," " 'I don't give a shit about that or them, you need to make a decision now.' " Hebert continued to work with Getty until August 6, 2013, when he voluntarily resigned to pursue other opportunities, including working for InVision, one of Getty's competitors.

On August 22, 2013, Hebert received several messages from fellow photographers asking about Getty's e-mail. That night, at an event, several photographers asked about the e-mail. For the next few weeks, Hebert was "constantly and repeatedly asked about this e-mail," Walter's comments, and what happened with Getty. Other individuals, including picture desk editor Brian Schaefer, told Hebert they did not want a professional or personal relationship with Hebert because of what they'd heard happened with Getty.

6

At another event in December 2013, a Getty representative, Michael Bezijian, claimed that Hebert did not have the credentials to be at the event. Hebert received a text message claiming that he did not have permission to post photographs.

Hebert denied threatening to hit Harris with a bat, making derogatory comments about Yaganti, shoving Akpanudosen, and tampering with a marked spot belonging to another photographer.

### 2. Erik Jordan's declaration.

Jordan, a professional photographer, photographed many of the same events as Hebert. Jordan was at the music festival in April 2013 with Harris and Hebert, and he never noticed tension between them. Harris never mentioned that Hebert had threatened him. Jordan never heard Hebert make derogatory or racist comments about any individual, including Yaganti. In his experience working with Hebert, Jordan never saw Hebert behave unprofessionally.

### 3. Declaration of Rob LaTour.

LaTour, a professional photographer, was at the movie event on August 13, 2013. He did not witness any act of verbal or physical aggression by Hebert at that or any other event.

### 4. Declaration of Juan Llauro.

Llauro is a professional photographer. He too was at the movie event on August 13, 2013. He did not witness any act of verbal or physical aggression by Hebert at that or any other event. Hebert is one of the "nicest photographers" Llauro has ever encountered.

### 5. Declaration of Andreas Branch.

Branch is a professional photographer. He never witnessed Hebert engage in any act of verbal or physical aggression.

### 6. Declaration of Alan Hess.

Hess is a professional photographer who began shooting events with Hebert in 2009. Hess lectures and authors books about concert photography. He is therefore

7

exceedingly vigilant of other photographers' behavior.  In all the years he's worked with Hebert and attended the same events, Hess has never seen Hebert engage in unprofessional conduct.

        D.      *Evidentiary objections.*

        Hebert, Getty and Walter submitted written evidentiary objections to the other's evidence.

        E.      *The trial court's ruling.*

        The trial court denied the motion.  The court first found that Getty had met its burden of showing that the action "arises from" Getty's exercise of free speech or petition and that the speech involved a matter of public interest; namely, an "interest in maintaining safe workplaces."  The court, however, then found that Hebert had met his burden of demonstrating a probability of prevailing on the merits.  As to the defamation cause of action, the court found that Getty's statements that Hebert had a " 'chip on his shoulder' " and was " 'aggressive' " were nonactionable statements of opinion.  But the accusation that Hebert " 'aggressively laid hands' " on another photographer was tantamount to an accusation Hebert committed the crime of battery.  Because Hebert submitted declarations from other photographers stating they never witnessed such an incident, the evidence was sufficient to show slander.  The court rejected the common interest privilege, because there was evidence the e-mails were motivated by hatred or ill-will.

        The trial court did not rule on the parties' evidentiary objections or the request for judicial notice.

**DISCUSSION**

**I.**        **Special motions to strike and the standard of review.**

        Section 425.16, commonly referred to as the anti-SLAPP statute, provides "for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 312, 315.)

8

The section provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)  The statute has several definitions of what constitutes an "act . . . in furtherance of [a] person's right of petition or free speech," but the one relevant here is "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subds. (b)(1) & (e).)[3]

A determination whether a cause of action must be stricken under section 425.16, subdivision (b)(1), involves a two-step process.  First, the court decides whether the defendant made a threshold showing that the challenged cause of action is one "arising from" protected activity.  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76.)  Second, if the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim.  (*Ibid.*)  "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)  The section is to be broadly construed.  (§ 425.16, subd. (a).)

We review an order granting or denying an anti-SLAPP motion de novo.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)  We consider the "pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)  But we neither " 'weigh credibility [nor] compare the weight of the evidence.  Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has

---

[3]    Defendants' argument relies solely on subdivision (e) of section 425.16.

9

defeated that submitted by the plaintiff as a matter of law.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

**II.      Defendants failed to establish that their e-mails arise from protected activity.**

The first step in analyzing whether Hebert's causes of action should be stricken is determining whether the e-mails were an act in furtherance of defendants' right of petition or free speech "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)  Whether something is a public interest is to be broadly construed. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 464 (*Hecimovich*).)  Still, "public interest" does not equate with mere curiosity. (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 932.)  Rather, "a matter of public interest should be something of concern to a substantial number of people" and "there should be some degree of closeness between the challenged statements and the asserted public interest." (*Id.* at p. 933.)  " '[G]enerally, "[a] public issue is implicated if the subject of the statement or activity underlying the claim (1) was a person or entity in the public eye; (2) could affect large numbers of people beyond the direct participants; or (3) involved a topic of widespread, public interest." [Citations.]' " (*Id.* at p. 934; see also *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 373.)

Defendants suggest that the e-mails concerned a matter of public interest because Hebert markets himself as a photographer who shoots the " 'biggest icons of this and any generation.' " Thus, Hebert is in the public eye.  Not so.  People may be interested in the subjects of Hebert's photographs, but that is different than a public interest *in Hebert*. (See, e.g., *Albanese v. Menounos, supra,* 218 Cal.App.4th at pp. 936-937 [celebrity stylist was not a public figure].)  That Hebert photographs people who are in the public eye does not, by itself, make Hebert a  public figure.

Nor did the e-mails affect large numbers of people beyond the direct participants. The direct participants were two select groups:  six managers at InVision and approximately 60 freelance photographers who worked for Getty.  The subject of the e-mails was Hebert's allegedly unprofessional behavior toward coworkers.  His conduct—

shoving another photographer and stealing spots reserved for other photographers—probably interested Hebert's colleagues. But there was no showing his behavior affected people other than Hebert's colleagues. (See, e.g., *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [union's statements concerning termination of a supervisor of eight custodians at a public university were "hardly a matter of public interest"]; *Albanese v. Menounos, supra,* 218 Cal.App.4th 923 [allegation that celebrity stylist stole designer items from a television personality was a private dispute].)

Cases have, however, found that matters of concern only to a small segment of society can be ones of public interest. (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 115, 118 (*Du Charme*) ["public interest" has been construed to include " 'private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.]' [Citations .]"]; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650 [matters of public interest can include activities involving private persons and entities, especially when a large, powerful organization like the Church of Scientology, may impact the lives of many individuals], disapproved on other grounds by *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53; *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 [statements about a manager of homeowners' association concerned matters of interest to "a large segment of our local population"].) But when the issue is of interest to only a limited segment of the public, to be protected the activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging participation in matters of public significance. (*Du Charme,* at p. 119.) In *Du Charme*, a local union stated on its website that Du Charme had been removed from office for financial mismanagement. (*Id.* at p. 113.) While the statement was of interest to the union's membership, it was "unconnected to any discussion, debate or controversy"; hence it was unprotected activity. (*Id.* at p. 118;

11

accord, *Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP* (2007) 146 Cal.App.4th 841, 846; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th 913; *Albanese v. Menounos, supra,* 218 Cal.App.4th 923.)

Here, we will assume that the people at InVision and the 60 or so photographers who received Walter's e-mails were a "definable *portion* of the public" or a "*narrow segment of society*" interested in how Hebert behaved at events. (*Du Charme, supra,* 110 Cal.App.4th at p. 118.) There is no link, however, between Hebert's behavior and any controversy, debate or broader social issue concerning paparazzi and celebrities. (See generally *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1570 [" 'The fact that "a broad and amorphous public interest" can be connected to a specific dispute is not sufficient to meet the statutory requirements' of the anti-SLAPP statute"; we focus on the specific nature of the speech, not the generalities that might be abstracted from it].)

Finally, although both e-mails referenced Hebert's aggressive behavior, which could implicate workplace safety (see, e.g., *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1653 ["We are also swayed by the public interest in safe workplaces, and in the liability which may attach to employers who fail to investigate prospective employees where prudence justifies such an investigation."]), the primary focus of the communications involved an ordinary workplace dispute. On this record, whether a celebrity photographer "aggressively laid hands" on another photographer or appropriated someone's spot on the red carpet is a specific, workplace dispute unconnected to the public interest in the safety of employees, coworkers, celebrities, and children. (Cf. *Hecimovich, supra,* 203 Cal.App.4th at p. 468 [allegedly defamatory communications concerned the well-being of children in afterschool sports]; *Cross v. Cooper, supra,* 197 Cal.App.4th 357 [renter's disclosure to prospective buyers that registered sex offender lived nearby concerned the public's interest in preventing child sexual abuse and protecting children from sexual predators]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547 ["The issue as to whether or not

12

an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest"].) Moreover, not every criticism of unlawful workplace activities concerns a public issue. "[U]nlawful workplace activity below some threshold level of significance is not an issue of public interest, even though it implicates a public policy." (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th at p. 924; accord, *Kurwa v. Harrington, Foxx, Dubrow & Canter, LLP*, *supra*, 146 Cal.App.4th at pp. 848-849 [rejecting argument that because statement concerned the provision of healthcare the statement concerned a matter of public interest].)

Accordingly, defendants failed to establish the first prong of section 425.16, that Hebert's causes of action arise from protected activity. We therefore need not decide the remaining issues defendants raise, including whether Hebert established a probability of prevailing on the merits.

## DISPOSITION

The order is affirmed.  Plaintiff and respondent Paul Hebert is to recover his costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


EDMON, P. J.


LAVIN, J.

14