Filed 11/30/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JASON FLICKINGER,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GORDON J. FINWALL,<br><br>    Defendant and Appellant. | B322736<br><br>Santa Clara County<br>Super. Ct. No. 19CV355773 |

    APPEAL from an order of the Superior Court of Santa Clara County.  Christopher G. Rudy, Judge.  Reversed and remanded with instructions.

    Murphy, Pearson, Bradley & Feeney, Jonathan M. Blute and Jackson L. Stogner for Defendant and Appellant.

    Gates Eisenhart Dawson, Marc A. Eisenhart, James L. Dawson, Steven D. McLellan and Claire A. Melehani for Plaintiff and Respondent.

    _____

This is an appeal from an order denying defendant Gordon J. Finwall's motion to strike plaintiff Jason Flickinger's causes of action against him pursuant to the anti-SLAPP statute, section 425.16 of the Code of Civil Procedure.[1]  There is no dispute that defendant's underlying conduct was in furtherance of petitioning activity within the meaning of section 425.16, subdivision (b)(1).  But the trial court concluded defendant's prelitigation letter responsive to a demand from plaintiff's counsel amounted to extortion as a matter of law so as to deprive it of section 425.16 protection under *Flatley v. Mauro* (2006) 39 Cal.4th 299, 320 (*Flatley*).

We interpret *Flatley* as holding an attorney's prelitigation communication is extortion as a matter of law only where the attorney's conduct falls entirely outside the bounds of ordinary professional conduct.  We find that defendant's letter falls within the boundaries of professional conduct and therefore the *Flatley* exception to anti-SLAPP protection does not apply.  We therefore conclude that defendant made a prima facie showing under the first prong of the anti-SLAPP analysis.

Even though the trial court declined to reach it, we exercise our discretion to consider the second prong of the anti-SLAPP analysis and conclude that plaintiff failed to meet his burden to show a probability of prevailing on his causes of action.  The sole cause of action that plaintiff defends on appeal is for civil extortion.  We agree with defendant that the litigation privilege defeats this cause of action.

Accordingly, we reverse the order of the trial court and remand with instructions to grant defendant's motion and award

---

[1]     SLAPP is the acronym for "strategic lawsuit against public participation."  All further undesignated statutory references are to the Code of Civil Procedure.

defendant fees and costs pursuant to section 425.16, subdivision (c)(1).

## BACKGROUND

Plaintiff is a homeowner. In 2014 he engaged a contractor, Robert Pendergrast, to remodel or otherwise improve various parts of his property. In early 2015, after Pendergrast had already done extensive work on the home, he agreed to remodel plaintiff's kitchen for an additional $60,000 in cash.

Several months later, while the kitchen work was still ongoing, plaintiff had Pendergrast over one evening for a social visit. During the visit, plaintiff, while "very drunk," confided to Pendergrast that plaintiff had gotten the cash to fund the remodeling project illegally. Plaintiff, who was an employee of Apple, told Pendergrast he had taken kickbacks from Apple vendors while on business in China. Despite this, Pendergrast continued working for plaintiff.

A month or so later, in early 2016, Pendergrast observed plaintiff in his living room counting what Pendergrast estimated to be $1 million in cash. Pendergrast still continued working for plaintiff.

In March 2016, plaintiff gave Pendergrast $900 in cash and asked him to buy computer equipment with it, ostensibly as part of the remodeling project. To Pendergrast, the request seemed like an effort to further involve Pendergrast in plaintiff's money laundering scheme. Upset, Pendergrast walked off the job, leaving plaintiff's kitchen in a state of disarray.

According to plaintiff's declaration, Pendergrast told plaintiff upon leaving that there were "a lot of electrical things he did to [plaintiff's] house that only [Pendergrast] kn[ew] about and [plaintiff] need[ed] to pay him to fix them." After plaintiff demanded to see building permits that Pendergrast had not obtained, things got worse. Plaintiff threatened to "report"

3

Pendergrast, and Pendergrast responded with a threat to expose compromising photographs of plaintiff with a colleague.

About three months later, Pendergrast left plaintiff a voicemail—plaintiff does not say what prompted it or what had transpired in the intervening months—reiterating that he "[had] pictures" and further stating he was "working with somebody for Apple with the fraud department," adding, among other things, "don't f*** with me." Nonetheless, plaintiff invited Pendergrast to his house two days later to discuss the work that remained unfinished in his home. Plaintiff does not say whether that meeting occurred. If it did, it failed to resolve things between the men.

About six months later, plaintiff, through counsel, made a demand on Pendergrast for $125,000, presumably representing his claimed cost to finish the remodeling work. On December 14, 2016, Pendergrast responded through counsel—defendant herein—in a letter rejecting the demand. After cataloging other complaints plaintiff had already made against Pendergrast—with the California Labor Commissioner and the Contractors State License Board—defendant's letter turned to the merits of plaintiff's threatened litigation:

"[Y]ou mention that Mr. Pendergrast was involved in construction activities at [plaintiff's] home. However, Mr. Pendergrast was not operating as a general contractor and [plaintiff] made his own decision to not pull permits. . . . The relationship ended when Mr. Pendergrast determined it was likely that [plaintiff] was laundering ill-gotten money obtained while in the employ of Apple. [¶] I am not sure how you came up with the figure of $125,000. This outrageous demand appears like a threat to further torment Mr. Pendergrast by all means possible, and [plaintiff] has already made retaliatory claims to the Labor Commissioner and [Contractors State License Board]

4

and now he makes another one through you.  If [plaintiff] initiates litigation, Mr. Pendergrast's position will not change and he will aggressively defend himself.  I suggest you discuss with [plaintiff] how such litigation may result in Apple opening an investigation into [plaintiff's] relationships with vendors."

The lawyers' exchange did not lead to a settlement. Plaintiff sued Pendergrast in Santa Clara Superior Court in 2017, commencing what we call *Flickinger I.  (Flickinger v. Pendergrast* (Super. Ct. Santa Clara County, 2019, No. 17CV306836).)

**1.** ***Flickinger I***

Plaintiff asserted just one cause of action—breach of contract—against Pendergrast in *Flickinger I.  One aspect of the alleged breach was that Pendergrast agreed, but failed, to obtain building permits for plaintiff's kitchen remodel.  Pendergrast's defenses relied in large part on the allegation, previewed in defendant's December 2016 letter, that plaintiff told him not to obtain permits.  In a signed interrogatory response, Pendergrast stated: "[Plaintiff] advised [Pendergrast] not to obtain a building permit for the kitchen remodel.  [Plaintiff] did not want a permit because he did not want a public record of his expenditures as he was spending beyond his means.  While on company business for Apple in China, he had received large illegal under the table cash payments from an Apple vendor and carried the cash, unreported, back to the United States.  He was using the ill-gott[e]n cash to pay [Pendergrast] and other expenses."

Defendant sought to substantiate these allegations through discovery.  He deposed plaintiff, asking a number of questions about his Apple-related overseas vendor contacts.  Plaintiff refused to answer these questions based on his Fifth Amendment right against self-incrimination.  Defendant then subpoenaed Apple for records relevant to plaintiff's dealings with Apple

5

vendors.  Apple objected on relevance grounds.  Defendant met and conferred with Apple's counsel, explaining the relationship between Pendergrast's unclean hands defense and plaintiff's work for Apple.  When his explanation failed to persuade Apple to turn over any records, defendant dropped the matter and stopped communicating with Apple.

Even without the Apple documents, defendant prepared and submitted a proposed statement of decision for Pendergrast in *Flickinger I* alluding to the kickback allegations.  This included the proposed factual finding that "[w]hile [Pendergrast] had obtained a building permit for the 2014 home addition project, [plaintiff] instructed [Pendergrast] not to obtain a permit for the kitchen remodel.  [Plaintiff] informed [Pendergrast] at the outset that he did not want a permit so as not to create a public record of spending beyond his means."  He then referred back to this fact in support of the affirmative defenses of illegality unclean hands, equitable estoppel, and waiver.

The *Flickinger I* trial court ruled in favor of plaintiff.  In explaining the basis for its decision,[2] it repeatedly addressed disputed facts about why there were no building permits for plaintiff's kitchen remodel.  For example, it summarized plaintiff's testimony regarding the key elements of the contract between plaintiff and Pendergrast as follows:  "(1) [Pendergrast] was to complete all work up to code, (2) [*Pendergrast*] *was to obtain all necessary permits and inspections*, and (3) [Pendergrast] was to complete the work in a workmanlike

---

[2]     We grant plaintiff's request for judicial notice, which includes the statement of decision by the *Flickinger I* court. Defendant did not oppose plaintiff's request and we agree with plaintiff that the trial court below relied in part on the *Flickinger I* court's analysis in rendering its decision, even though the analysis was not formally made part of the record.

manner." (Italics added.) At the same time, it recognized Pendergrast's assertion that "[p]laintiff did not obtain permits so as to hide the expenditure of cash for home improvements [and] acted in a deliberate way to prevent a public record of his spending."

Without resolving the factual conflict, the *Flickinger I* trial court laid the blame for not getting permits with Pendergrast based on his status as a licensed professional. It deemed— without citation to on-point authority—Pendergrast's failure a breach as a matter of law without regard to any terms of the actual agreement between the parties. The court rejected Pendergrast's affirmative defenses of unclean hands, equitable estoppel, and waiver. It relied on Pendergrast's status as a licensed professional to reject his arguments that plaintiff bore some responsibility for the lack of permits because plaintiff had instructed Pendergrast not to get them. Again, the trial court cited no on-point authority for the proposition that plaintiff's instruction to Pendergrast not to get permits, if proven, was irrelevant as a matter of law to his defenses.

The court imposed on Pendergrast the costs of completing the job as fully permitted and inspected, including the costs of removing walls and other demolition that was necessary to allow inspection of Pendergrast's work. It awarded plaintiff a total of $169,000 in general damages.

Defendant represents, and plaintiff does not dispute, that at no point in *Flickinger I* was there any allegation by plaintiff or finding by the court of bad faith or abuse of process with respect to defendant asserting affirmative defenses related to plaintiff's illegal funding for the project, nor for asking plaintiff about the funding in his deposition, nor for seeking discovery from Apple.

7

### 2.    *Flickinger II*

While *Flickinger I* was still pending, plaintiff filed a second action relating to other work Pendergrast did on his home, this time suing both Pendergrast and defendant. This appeal arises from this second action. Only plaintiff's causes of action against defendant are relevant to this appeal. These are (1) civil extortion, and (2) violation of the Ralph Civil Rights Act, Civil Code section 52. Each is based on allegations that defendant "used threats, intimidation, and coercion to prevent [p]laintiff from filing [*Flickinger I*]" based on defendant's December 2016 letter to plaintiff's counsel responding to his prelitigation demand.

Defendant filed an anti-SLAPP motion to strike plaintiff's causes of action and plaintiff opposed it. The trial court denied defendant's motion on the basis that defendant's December 2016 letter amounted to extortion and was therefore unprotected activity under *Flatley*, *supra*, 39 Cal.4th 299.

Defendant timely appealed pursuant to section 904.1, subdivision (a)(13).

## DISCUSSION

### 1.    **Standard of Review**

We review a trial court's order granting an anti-SLAPP motion de novo, considering the pleadings and affidavits submitted in support of, or in defense to, the subject claims. (*Verceles v. Los Angeles Unified School District* (2021) 63 Cal.App.5th 776, 785.)

### 2.    **Overview of the Anti-SLAPP Statute**

The anti-SLAPP statute provides a mechanism for early assessment of claims implicating certain protected speech activities. Qualifying claims found to be without merit must be stricken and costs and expenses awarded to the defendant. (§ 425.16, subd. (c)(1).) This relieves defendants wrongfully sued

8

for engaging in protected activities of the time and expense of litigation.

The statute imposes on the defendant an initial burden to show the challenged claims qualify for protection under the statute. (§ 425.16, subd. (b)(1).) If the defendant satisfies this burden, the plaintiff then bears the burden to establish a probability of prevailing on the challenged claims. (*Ibid*.)

The statute applies only to claims "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Such acts are broken into four illustrative categories of conduct in section 425.16, subdivision (e).

Due to the important interests it seeks to protect, the Legislature commands that we construe the anti-SLAPP statute broadly. (§ 425.16, subd. (a); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 92.) However, "not all speech or petition activity is protected by section 425.16." (*Flatley*, *supra*, 39 Cal.4th at p. 313.) Of relevance here, section 425.16 does not protect "speech or petition activity that [i]s illegal as a matter of law." (*Flatley,* at p. 320.) We refer to this exception as the "*Flatley* exception." As further discussed below, the *Flatley* exception applies only in "narrow circumstance[s]" where "either the defendant concedes, or the evidence conclusively establishes" illegality as a matter of law. (*Id.* at pp. 316, 320.)

3. **Analysis**

We first consider whether defendant's December 2016 letter responding to a prelitigation demand from plaintiff's counsel is protected under section 425.16. We conclude that it is, and then proceed to consider whether plaintiff met his burden to show a likelihood of prevailing on the merits. We are entitled to do so even though the trial court did not consider the probability

9

that plaintiff could prove his claims. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 468.)

### a. The December 2016 letter was protected petitioning activity

Section 425.16 protects any conduct in furtherance of the exercise of the constitutional right of petition. (*Id.*, subd. (e)(4).) Prelitigation communications may qualify for this protection so long as they " 'concern[] the subject of the dispute' and [are] made 'in anticipation of litigation "contemplated in good faith and under serious consideration . . . ." ' " (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1268.)

There is no dispute that defendant's December 2016 letter satisfies these preliminary requirements. It was written in response to a prelitigation demand from plaintiff's counsel and previewed Pendergrast's litigation posture.

The parties dispute whether defendant's statement that "such litigation may result in Apple opening an investigation into [plaintiff's] relationships with vendors" and corresponding reference to "ill-gotten money obtained while in the employ of Apple" triggers the *Flatley* exception, taking it outside the protection of section 425.16.

According to plaintiff, this statement is "textbook" extortion so the *Flatley* exception applies. Extortion includes "the obtaining of property or other consideration from another, with his . . . consent . . . , induced by a wrongful use of force or fear . . . ." (Pen. Code, § 518, subd. (a).) What constitutes a wrongful use of force or fear for these purposes is defined in Penal Code section 519 (*People v. Beggs* (1918) 178 Cal. 79, 83–84), and includes "a threat . . . . [¶] [t]o expose, or to impute to [the person threatened a] disgrace, or crime . . . " (Pen. Code, § 519).

According to defendant, his statement was a permissible threat under *Malin v. Singer* (2013) 217 Cal.App.4th 1283 (*Malin*), which recognized that certain threats to disclose information in litigation do not amount to extortion as a matter of law.  (*Id.* at pp. 1298–1299.)

We discuss these authorities at some length below.

### i.  *Flatley*

Flatley, a celebrity dancer, sued Mauro, an attorney, under various tort theories based on a letter Mauro sent to Flatley and telephone conversations Mauro had with Flatley's counsel.  (*Flatley*, *supra*, 39 Cal.4th at p. 305.)  The question before the Supreme Court was whether Mauro's communications to Flatley and his counsel were protected under the anti-SLAPP statute.  (*Flatley,* at p. 305.)

Mauro sent the letter to Flatley on behalf of his client who claimed her sexual encounter with Flatley in a Las Vegas hotel was nonconsensual.  (*Flatley*, *supra*, 39 Cal.4th at p. 305.)  The letter was sensational, plainly designed to shock Flatley into submission and a large settlement.  Among other things, it accused Flatley of rape, referenced a police report that evidence later showed was a sham, discussed the prospect of punitive damages to " 'send[] a message,' " referred to a recent $100 million punitive damages award made in another case, and emphasized that Flatley's personal assets were in peril.  (*Id.* at p. 308.)  In a follow-up call with Flatley's lawyer, Mauro demanded at least $1 million to settle.  (*Id.* at pp. 311, 329.)

The letter further contained specific threats to distribute information about Flatley outside the confines of the threatened litigation absent a settlement.  First, it threatened to use the press to generate negative publicity around Flatley.  Mauro listed not fewer than 18 news sources that would receive a press release at the time of suit.  (*Flatley*, *supra*, 39 Cal.4th at pp. 329, 339.)

11

In a follow-up call with Flatley's lawyer, Mauro elaborated that he " 'already ha[d] the news media lined up' and would 'hit [Flatley] at every single place he tours.' " (*Id*. at p. 310.) Second, it threatened to use information obtained in discovery to expose any illegality—including " 'violation[s] of any U.S. Federal, Immigration, I.R.S., S.S. Admin., U.S. State, Local, Commonwealth U.K., or International Laws' "—to " 'any and all appropriate authorities.' " (*Id*. at p. 309, boldface omitted.)

Even the letter's formatting was outrageous, prompting the Supreme Court to take the unusual step of appending it to its opinion. (*Flatley*, *supra*, 39 Cal.4th at p. 307 & fn. 5.)

On these facts, the *Flatley* court found that Mauro's letter and subsequent telephone calls to Flatley's attorneys constituted extortion as a matter of law and therefore were not protected under section 425.16. (*Flatley*, *supra*, 39 Cal.4th at p. 328.) This conclusion rested on five aspects of Mauro's conduct.

First, Mauro's letter contained accusations of criminal conduct which he threatened to expose directly "to the 'worldwide' media," not merely indirectly as a result of commencing litigation. (*Flatley*, *supra*, 39 Cal.4th at p. 330.) Second, his threat to expose "criminal activity entirely unrelated to any alleged injury suffered by [his] client 'exceeded the limits of [his] representation of his client' [which was] itself evidence of extortion." (*Id*. at pp. 330–331.) Third, the Supreme Court found the threat of a rape allegation was extortion based on evidence that Mauro's client's initial police report was devoid of content and merely a sham designed to "hold a police investigation over Flatley's head." (*Id*. at pp. 331–332.) Fourth, Mauro threatened that Flatley's bad acts referenced in his letter "were 'just the beginning,' " suggesting that "Flatley would be exposed to various kinds of opprobrium and he would be disgraced thereby unless he met Mauro's demands." (*Id*. at p. 332.) Fifth, and finally, in his

12

follow-up calls to Flatley's counsel, "Mauro did not discuss the particulars of the claim or show an interest in negotiations." (*Ibid*.)  Rather, he simply reiterated his demand for payment and beat the drum of the consequences if Flatley refused to capitulate:  Mauro would " 'go public' and 'ruin' Flatley . . . ." (*Ibid*.)

The *Flatley* court went to great lengths to limit the scope of the crime-as-a-matter-of-law exception to section 425.16 protection.  It explained that its "conclusion that Mauro's communications constituted criminal extortion as a matter of law [was] based on the specific and extreme circumstances of th[e] case" and cautioned that its "discussion of what extortion as a matter of law is [was] limited to the specific facts of th[e] case." (*Flatley*, *supra*, 39 Cal.4th at p. 332, fn. 16.)  It further cautioned that its analysis did not render "rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing," extortion per se.  (*Ibid*.)  Rather, petitioning activity can be criminal extortion as a matter of law for purposes of the *Flatley* exception only in the "narrow circumstance" where "the defendant concedes the illegality of [his] conduct or the illegality is conclusively shown by the evidence . . . ."  (*Id*. at p. 316.)

### ii.   *Malin*

Malin, a restauranteur, sued Singer, an attorney, under various tort theories based on a letter Singer sent to Malin. (*Malin*, *supra*, 217 Cal.App.4th at pp. 1287–1288, 1290.)  The question on appeal, like in *Flatley*, was whether Singer's letter was protected under the anti-SLAPP statute.  (*Malin,* at p. 1287.)

Singer sent the letter on behalf of his client, a business partner of Malin's, who claimed Malin had misappropriated assets from a company they co-owned.  The letter attached a copy

of a proposed complaint and demanded a resolution of the matter "to [Singer's] client's satisfaction within five (5) business days from [Malin's] receipt of [the letter]." (*Malin*, *supra*, 217 Cal.App.4th at p. 1289.)  Importantly, the draft complaint contained allegations that Malin used the misappropriated funds to arrange sexual encounters with various partners but left blank their names.  In the demand letter, Singer explained: " 'I have deliberately left blank spaces in portions of the Complaint dealing with your using company resources to arrange sexual liaisons with older men such as "Uncle Jerry," Judge [name redacted], a/k/a "Dad" (see enclosed photo), and many others.  When the Complaint is filed with the Los Angeles Superior Court, there will be no blanks in the pleading.' " (*Ibid.*, italics omitted.)

The *Malin* court determined that the *Flatley* exception did not apply and Singer was entitled to invoke the protection of section 425.16.  It reached this conclusion because "Singer's demand letter did not expressly threaten to disclose Malin's alleged wrongdoing to a prosecuting agency or the public at large." (*Malin*, *supra*, 217 Cal.App.4th at p. 1298.)  The court reasoned that the secret that would "expose" Malin to "disgrace" for purposes of the extortion statute was "inextricably tied to [Singer's client's] pending complaint.  The demand letter accused Malin of embezzling money and simply informed [Malin] that [Singer's client] knew how [Malin] had spent those funds." (*Id*. at p. 1299.)

In summarizing its conclusion, the *Malin* court distinguished *Flatley* and another case as follows:  "We see a critical distinction between Singer's demand letter, which made no overt threat to report Malin to prosecuting agencies or the Internal Revenue Service, and the letters in *Flatley* and *Mendoza* [*v. Hamzeh* (2013) 215 Cal.App.4th 799], which contained those

14

express threats and others that had no reasonable connection to the underlying dispute." (*Malin*, *supra*, 217 Cal.App.4th at p. 1299.)

### iii. Why the *Flatley* exception does not apply

We agree with defendant that the *Flatley* exception does not apply to the facts of this case. Defendant's letter bears no resemblance to the "extreme" conduct in *Flatley* which warranted a "narrow" exception to the protections ordinarily accorded petitioning activities under section 425.16. (*Flatley*, *supra*, 39 Cal.4th at pp. 316, 332, fn. 16.)

*Flatley* recognized that not every threat by an attorney to settle or be sued is extortion. (*Flatley*, *supra*, 39 Cal.4th at pp. 316, 332, fn. 16.) We read *Flatley* as permitting a finding of extortion as a matter of law only where an attorney's threats fall wholly outside the bounds of professional norms.

Central to the *Flatley* court's concerns was that Mauro threatened to use information obtained through litigation to report criminal activities "entirely unrelated" to his client's claims to any applicable prosecuting agencies. (See *Flatley*, *supra*, 39 Cal.4th at pp. 330–331.) The court had earlier observed that threatening criminal charges to gain an advantage in a civil dispute is proscribed by the Rules of Professional Conduct in both California and Mauro's licensing state of Illinois. (See *Flatley,* at p. 327 & fn. 14.) His threat therefore " 'exceeded the limits of [his] representation of his client' [which was] itself evidence of extortion." (*Id.* at pp. 330–331.)

The *Flatley* court could have, but did not, limit its analysis to the fact that the threat was itself a breach of ethical rules. Instead, informed by judicial knowledge of ordinary attorney behavior, the *Flatley* court took pains to highlight Mauro's behavior that was entirely out of the ordinary. For example, it stressed Mauro's threat to not only burden Flatley with court

15

proceedings but with a lifetime of torment: he promised Flatley negative publicity " 'every place he [went] for the rest of his life.' " (*Flatley*, *supra*, 39 Cal.4th at p. 330.) Further, it noted Mauro's mode of negotiating fell outside of professional norms. He focused exclusively on extracting an offer of " 'sufficient payment,' " rather than engaging on the merits or particulars of his client's claims. (*Id*. at p. 332.) He set a settlement deadline four weeks out but then threatened to withdraw it eight days later if his phone call was not returned in 30 minutes. (*Id*. at p. 330.) And even his presentation in the initial demand letter—riddled with typos and produced with "various font sizes, boldface type, capital letters, underlining, and italics" reminiscent more of a Hollywood ransom note than professional correspondence—factored in the court's analysis. (*Id*. at p. 307.)

Defendant's conduct here stands in stark contrast to Mauro's in *Flatley*. Defendant's purportedly criminal communication was his December 2016 letter, sent to plaintiff's counsel and not to plaintiff directly, in response to a demand from plaintiff's counsel. In it, defendant addressed the merits of plaintiff's claims and offered facts relevant to his client's claimed lack of liability. He made no threat to report plaintiff to any prosecuting authorities. His only express "threat" was that his client, Pendergrast, would "aggressively defend himself" in litigation. The statement from which plaintiff and the trial court implied a further threat—defendant's suggestion that plaintiff's counsel advise plaintiff about how litigation "[could] result in Apple opening an investigation into [plaintiff's] relationships with vendors"—is not a threat that Pendergrast would report plaintiff to prosecuting authorities, and it does not lie so far outside the bounds of professional communication to amount to criminal extortion as a matter of law.

16

Defendant states by declaration that his reference to Apple in the December 2016 letter was meant at face value—that public litigation and civil discovery could lead to Apple learning of Pendergrast's kickback allegations and initiating an investigation.  Although plaintiff says he understood it as a threat to go accuse him of a crime, his subjective and self-serving interpretation cannot establish extortion as a matter of law.  (See *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 387.)

Plaintiff urges us to read *Malin* as protecting only threats to make allegations in a complaint that are "inextricably tied" to the complaint's causes of action, and argues that the illegal kickback and money laundering defendant suggested would be exposed if plaintiff sued Pendergrast were not even "reasonably connect[ed]" to the parties' dispute.  We disagree with both the legal and factual premises of plaintiff's argument.

It is true that the *Malin* court called the allegations of Malin's sexual activity Singer threatened to disclose in litigation "inextricably tied" to the underlying causes of action.  (*Malin*, *supra*, 217 Cal.App.4th at p. 1299.)  But in doing so, the court suggested a standard that only required them to be "reasonabl[y] connect[ed]" to be eligible for protection under section 425.16.  (*Malin,* at p. 1299.)  We agree with the *Malin* court's suggested standard.  In so agreeing, we note our disagreement that the threat in *Malin* to name socially prominent sexual partners, complete with pet names, age differences, and gender was "inextricably tied" to the allegations that Malin had misappropriated company assets.  (*Ibid.*)  Though the question is not before us, we disagree that these allegations were even reasonably connected to the plaintiff's underlying claims, and think the trial court was correct in deeming these same allegations " '*very tangential* to the causes of action in Defendants' complaint' " and not subject to protection under

17

section 425.16.  (*Malin,* at p. 1292, italics added.)  Room for such disagreement is perhaps inevitable where the inquiry is, per *Flatley*, entirely fact specific.

The reasonably connected standard is consistent with *Flatley*, where the court singled out as extortion Mauro's threats to disclose information "entirely unrelated" to his client's claimed harms.  (*Flatley*, *supra*, 39 Cal.4th at pp. 330–331.)  A threat that is "entirely unrelated" to the merits of the disputed claims is not "reasonably connected" to the actionable conduct.  But a threat does not have to be "inextricably tied" to the merits to avoid a finding it is "entirely unrelated."

An "inextricably tied" standard would encourage attorneys to withhold from prelitigation communications a complete picture of what their litigation strategy would be.  There is no requirement that pleadings be limited to only those allegations that are "inextricably tied" to the underlying cause of action.  Attorneys may, and frequently do, include in complaints allegations that are not essential to, but bear a reasonable connection to, the causes of action in order to provide helpful color.  Put another way, this is within the realm of ordinary professional conduct in litigation.  As defendant explains, "it is not improper for an attorney to warn his opponent of potential adverse consequences of litigation[; n]or is there anything improper about leveraging those potential consequences in an effort to dissuade one's opponent from filing suit."  A rule that would discourage counsel from engaging in an open prelitigation exchange of strategies or draft pleadings would make settlements more difficult to achieve.  This would contravene the "well-established public policy in this state that settlements of litigation are favored and should be encouraged."  (*Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1338.)

18

Applying the rule here, we view defendant's implied threat to make public allegations that plaintiff was involved in illegal kickback schemes and money laundering as reasonably connected to the parties' dispute. As explained above, plaintiff claimed in *Flickinger I* that Pendergrast breached his contract with plaintiff by failing to get permits for the kitchen work on plaintiff's house. According to plaintiff, Pendergrast had expressly agreed to get such permits. But Pendergrast's position was that there was no breach in this regard because plaintiff agreed Pendergrast would *not* get permits—because plaintiff did not want a public record of his spending above his legal means.

With contradictory testimony about why no permits were obtained, Pendergrast's explanation as to why plaintiff allegedly told him not to get permits bore a reasonable connection to the parties' dispute. Pendergrast acknowledged that his failure to obtain permits "can cause disciplinary problems with the [Contractors State License Board]," but argued that "when a homeowner directs a contractor not to get a permit and the contractor moves forward in reliance on that direction and decision, the homeowner is barred from later arguing that the contractor should have obtained the permit anyway."

The *Flickinger I* court found Pendergrast "breached the contract by failing to obtain all the necessary permits and inspections" without deciding whether plaintiff and Pendergrast agreed there would be no permits. Rather, it implied Pendergrast's agreement to obtain permits in the contract as a matter of law—any contrary agreement notwithstanding—based on his status as a professional contractor. But there was no suggestion that defendant arguing the parties had agreed *not* to get permits (and alleging the underlying reasons for that agreement) was in bad faith.

19

As already noted, the *Flickinger I* court's analysis cited no direct authority that Pendergrast's license status implied in his contract a promise to get permits even if the parties expressly agreed he would not. The apparent lack of authority on the topic, and the materiality of the issue, gave defendant leeway—and perhaps an obligation—to advance the position most favorable to his client. (See § 128.7, subd. (b)(2) [claims, defenses, and legal contentions in written submissions to court must only be "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law"]; Rules Prof. Conduct, rule 1.3 [imposing limited "reasonable diligence" obligation on attorneys, defined to include "act[ing] with commitment and dedication to the interests of the client"].) Defendant's warning in his December 2016 letter that he intended to do so was within the bounds of professional conduct and therefore not extortion as a matter of law.

### b. Plaintiff cannot demonstrate a likelihood of success on the merits

Plaintiff has forfeited his Ralph Act cause of action on appeal by failing to respond to defendant's arguments that it lacks merit. The trial court will dismiss this cause of action on remand. Accordingly, we consider only whether the record shows plaintiff has a probability of prevailing on his civil extortion cause of action. It does not.

A plaintiff cannot show a probability of prevailing on the merits of a cause of action for anti-SLAPP purposes where the cause of action is barred by the litigation privilege codified in Civil Code section 47. (*Flatley*, *supra*, 39 Cal.4th at p. 323; *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 887 (*Digerati*).) "The litigation privilege precludes liability arising from a publication or

20

broadcast made in a judicial proceeding or other official proceeding. ' "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action." [Citation.]  The privilege "is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." [Citation.]' [Citation.]  The litigation privilege is interpreted broadly in order to further its principal purpose of affording litigants and witnesses the utmost freedom of access to the courts without fear of harassment in derivative tort actions. [Citation.]  The privilege is absolute and applies regardless of malice." (*Digerati,* at pp. 888–889, fn. omitted.)

"A prelitigation communication is privileged only if it 'relates to litigation that is contemplated in good faith and under serious consideration' [citation] . . . .  The requirement of good faith contemplation and serious consideration provides some assurance that the communication has some ' " ' connection or logical relation' " ' to a contemplated action and is made ' " 'to achieve the objects' " ' of the litigation.  [Citation.]  'Whether a prelitigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact.' " (*Digerati*, *supra*, 194 Cal.App.4th at p. 889.)

The litigation privilege applies to defendant's December 2016 letter.  It related to litigation threatened by plaintiff against defendant's client.  For the reasons already discussed, the statements in the letter bore a connection or logical relation to the litigation and advanced Pendergrast's interest in avoiding the litigation.  The trial court should have stricken plaintiff's civil extortion claim.

21

### c. Defendant's request for attorney fees

Defendant requests that we award him attorney fees and costs under section 425.16, subdivision (c)(1), if he prevails. Defendant is correct that, as the prevailing defendant after appeal, he is entitled to attorney fees, including those incurred in this appeal. (*Wanland v. Law Offices of Mastagni, Holstedt & Chiurazzi* (2006) 141 Cal.App.4th 15, 21–22.) But, in part because his fees have continued to accrue through the prosecution of this appeal, the record is inadequate for us to do so. The trial court will consider defendant's request on remand.

### DISPOSITION

The order is reversed. The matter is remanded and the trial court is instructed to grant defendant's motion to strike plaintiff's causes of action against him for civil extortion and violation of the Ralph Act. The trial court shall further consider the amount of fees and costs to which defendant is entitled under section 425.16, subdivision (c). Defendant is to recover his costs on appeal.


GRIMES, J.


WE CONCUR:



STRATTON, P. J.




WILEY, J.


22